J. & H. SCHIEFFELIN *against* THE NEW-YORK INSURANCE COMPANY.

ALBANY,
Jan. 1812.

SCHIEFFELIN
v.
NEW-YORK
INS. CO.

THIS was an action on a policy of insurance, dated the 27th of June, 1809, on *goods*, laden on board the same ship *Dean*, for the same voyage as in the last case, with liberty to touch at *Tonningen, Amsterdam*, or *Rotterdam*, for a market, if not blockaded. The insurance was declared to be against " the *dangers of the seas only;* and in case of capture or detention, the risk to continue during and after such capture or detention." The loss was declared to be by the perils of the sea.

The cause was tried at the *New-York* sittings, on the 25th of *April*, 1811, before Mr. Justice *Thompson*. A verdict was taken for the plaintiffs, subject to the opinion of the court, on a case containing the same facts as are stated in the preceding case of *Bradhurst & Field* v. *The Columbian Insurance Company*, in the action on the policy on the *ship*.

*Colden*, for the plaintiffs. The wreck of the vessel was a total loss by the perils of the sea; and the insured had a right to abandon, which could not be taken away by any subsequent event. A total loss is either a loss of the subject or the voyage. A stranding, followed by shipwreck, is a total loss of all the subjects.[*] In *Manning* v. *Newnham*,[†] Lord *Mansfield* said the ship had received an irreparable hurt; the goods could not be carried on, and the voyage was totally lost.

*Insurance on goods from New-York to Bremen, with liberty to touch at Amsterdam, Rotterdam, or Tonningen, for a market, " against the dangers of the seas only;" and, " in case of capture or detention, the risk to continue during and after such capture and detention." The ship having sprung a leak, the master, without any intention of going to Amsterdam, but, from necessity, put into the Texel, where the ship was repaired, but was detained by an embargo, and ordered to Amsterdam. During this detention, a*

[*] 2 *Emerigon*, 180. 187. *Marshall on Ins.* 488. *Pothier*, n. 120. [†] *Park*, 221.

small part of the cargo, (a quantity of *Peruvian* bark,) by order of the government, and against the will of the master, was delivered, and the freight paid. The embargo being taken off, the ship, with the rest of the cargo, returned to the *Texel*, for the purpose of pursuing her voyage to *Bremen*, but was further detained, by a general regulation of the government, for four days at the *Texel*, and, while so detained, a violent storm arose, and for greater safety, and with the advice of the crew, the cables were cut, and the ship run on shore, in consequence of which she was so much injured, as not to be worth repairing, if got off, which was deemed impracticable. The cargo having been discharged on board of lighters, was seized and detained by order of the government, and carried to *Amsterdam*, where it was put into the king's stores. The cargo was not consigned to any particular place or person, but was to be delivered to the order of the shippers; and both ship and cargo were placed under the direction of the supercargo, (a part owner and one of the insured,) as to the destination of the ship and management of the cargo. It was held, that there was no acceptance of the cargo at *Amsterdam* or the *Texel*, by the *supercargo* or agent of the shippers; and that the loss of the voyage was occasioned by the *seizure*, which prevented the cargo from being sent on to its port of destination, in another vessel; the presumption being, from the circumstances of the case, and no evidence to the contrary being shown by the plaintiff, that had it not been for the *seizure*, another vessel might have been procured to carry on the cargo to *Bremen*.

It is the duty of the master, when the ship becomes disabled, during the voyage, to procure another vessel, if it is in his power; and the insurer is not answerable for the consequence of his voluntary neglect to do so, unless such neglect is caused by an act of *barratry*. And it is a general rule, that the plaintiff, in an action on the policy, in order to entitle himself to recover, on the ground of the loss of the voyage, must show that another vessel could not be obtained. See *Bradhurst & Field* v. *Col. Ins. Co. ante*, 9—16.

ALBANY,
Jan. 1812.

SCHIEFFELIN
v.
NEW-YORK
INS. CO.

As it regards the shipowner, or master, he is bound, by his contract, to carry on the goods; but, in regard to the insured, or owner of the goods, he is not responsible for the neglect or misconduct of the master. The owner of the goods does not undertake for his good conduct. There is no contract between the insurers and the insured, by which the latter can be liable for the misconduct of the master; but, after the shipwreck or peril has happened, the insurer becomes responsible for all the consequences; and if the master fail in his duty to the shipowner, it is *barratry*. Any unlawful act, though not fraudulent, and though done for the benefit of the owner, is barratry. The insurer cannot, when a loss has happened by a peril against which he was insured, set up another, as barratry, to prevent a recovery.[*]

* *Gardere v. Col. Ins. Co. 7 Johns. Rep. 514.*

Again, admitting it to be the duty of the master, after the ship becomes incapacitated to pursue her voyage, to find another vessel, and carry on the goods to their port of destination; yet the goods must be in such a situation that they can be carried on. But, in this case, the goods, on going into the *Texel*, were immediately detained by the embargo, and were afterwards seized in the lighters, so that they could not be carried to the port of destination.

It will, perhaps, be said, that the loss was owing not to the stranding, and consequent shipwreck, but to the seizure on board the lighters, as the proximate cause of loss; and the case of *Levie* v. *Janson*[†] will be relied on for this doctrine. But that case, recently decided in *England*, is not an authority; nor is it, for any reason contained in the case, entitled to the weight of an authority. Lord *Ellenborough*, in giving his opinion, proceeds on the ground of mere *sea-damage*, or deterioration by the first accident, which would not, of itself, give a right to abandon for a total loss; but there was, in fact, a *shipwreck*. The vessel was rendered, by the stranding, completely innavigable. No doubt, where an accident happens, which merely retards the vessel in her voyage, and she afterwards proceeds and is captured, the last event is to be alone regarded as the cause of loss. In the case of *Green* v. *Elmslie*,[‡] on which his lordship relies, the vessel was not lost, nor even damaged by running ashore, and the only cause of loss was the capture.

† *12 East, 647.*

‡ *Peake's Cases, 212.*

Now, in the present case, such a loss happened by the perils of the sea, as would be a sufficient ground of abandonment, prior to the seizure of the goods in the lighter. The peril had happened against which the insurance was made, and the defendants cannot

avail themselves of the subsequent events to resist the claim of the plaintiffs.

Again, did the goods arrive at their port of destination, or were they delivered to the consignees, or the insured? The master swears, positively, that he never intended to deliver any part of the cargo at *Amsterdam;* and that he never did deliver it to the consignees. The mere circumstance of the consignee of some of the goods being at *Amsterdam,* does not vary the case, when, by the terms of the bill of lading, they were to be delivered at *Bremen.* The endorsement made by Messrs. *Willincks* on the bill of lading, that they had received the bark, but ordering the other merchandise to be delivered at *Bremen,* shows conclusively that *Bremen* was the port of destination. There was no delivery to Mr. *Field,* the supercargo, for the goods were detained by the government, as soon as they were put on board of the lighters, and were seized before they touched *Amsterdam.* There is no direct evidence of any delivery to the supercargo, or that he was on board when the goods were put into lighters, though it has been so inferred, from the fact that the cargo was placed under the direction of *Field,* as supercargo.

*Hoffman* and *T. A. Emmet,* contra. The only question in this case is, whether there has been a loss by the *perils of the sea.* The goods were not damaged, and if there is a total loss, it can be only by the operation of the perils of the sea, not directly on the goods, but on the voyage, so as to prevent their arrival at the port of destination. *Stranding,* though followed by shipwreck, does not, in all cases, produce a loss of the cargo. The goods may be saved, though the vessel is lost. In *Levie* v. *Janson,* though the vessel was stranded, and it took six weeks to get her off, it was not pretended that there was a total loss by the perils of the sea. The loss in this case is averred to be by the perils of the sea; but the injury was to the ship, not to the cargo. The loss of one subject cannot, of itself, be considered as the loss of another distinct subject, unless such be the immediate and direct consequence of the injury to the first subject.* The mere destination of the vessel does not defeat the voyage, as it respects the cargo, unless it is also shown that the goods could not be sent, in any other vessel, to their place of destination. Now, if we look at the *map* of *Holland,* it will be seen that the very lighters in which the goods were put, might have passed by the *Zuyder Zee* to *Bremen,* or from the *Texel,* through the *Diep Zee,* between the

ALBANY, Jan. 1812.

SCHIEFFELIN v. NEW-YORK INS. CO.

* *Goold* v. *Shaw,* 1 *Johns. Cases,* 296.

ALBANY,
Jan. 1812.

SCHIEFFELIN
v.
NEW-YORK
INS. CO.

islands and the shore, which is a usual and safer route than by the open sea. It was as easy to go to *Bremen* as to *Amsterdam*. But it is said that the cargo could not be sent in another vessel, because it was seized by the government, on board the lighters; but the defendants are not answerable for any loss arising from seizure or detention, except for perils of the sea happening during a detention.

It may be made a question whether the master, after the loss of the vessel in which the goods were shipped, is bound to send them to their place of destination, by another vessel, if one can be obtained. It is a contract for the carriage of the goods from one place to another. The transportation is the principal thing, and the vessel or mode of conveyance is incidental. It is agreed, that the master has the right to hire another vessel and carry on the goods, so as to entitle him to full freight; and it has been said that a master has no authority to sell the cargo at an intermediate port, in any case whatever.* If the point is not clearly and positively settled, on principle, it ought to be decided, that what the master may do, he ought to do; and that it is his duty to find another vessel, if possible, by which to carry the goods to their place of destination. If, then, it is the duty of the master, under his contract, to hire another vessel, and carry on the goods, and he does not, and the voyage is, therefore, broken up, it is the fault of the master, for which the insurers are not liable. There cannot be an act of *barratry*, without fraud, except in the particular case of *smuggling*, or some act in violation of the laws of the country.

* 10 *East*, 143.
378. *Hunter v. Princep.*

Again, the goods had no particular destination, but were subject to the direction of the supercargo. *Field* returned on board the ship on the 15th of *August*, and the goods were discharged into lighters on the 21st; and it is a necessary inference that he was present, and gave directions relative to the cargo intrusted to his management. If the goods could not have been sent to *Bremen*, they might have been left at the *Helder*; but the supercargo elected to send them to *Amsterdam*, and he thereby made that the place of destination or delivery. The cargo was thus accepted by the consignee; for, though detained by the embargo, it was not seized, but sent to *Amsterdam*, in an opposite direction from the regular course of the voyage to *Bremen*; and at the quay at *Amsterdam* the goods were seized and put into the king's stores. If the goods did not reach *Bremen*, it was not because there was no vessel by which they could be carried, but because they were detained by the government. Then, we say, there has been no loss by the perils of the sea, or within the policy.

*D. B. Ogden*, in reply. According to the evidence in the case, and after all that has been said, there cannot remain a doubt that *Bremen* was the port of destination. As to the passage pointed out, from the *Texel* to *Bremen*, it does not appear that it was a safe or proper course. It abounds with islands or shoals, and is extremely dangerous.

The captain speaks of the goods, while in lighters, being detained in the *Texel* by *the embargo;* but he must have meant that they were seized by the government, for he had before stated that the embargo was taken off, and the vessel permitted to proceed on her voyage; and he was detained at the *Texel* only by a particular order, and for a particular purpose. The fact, then, was, that the goods were seized, as soon as they were on board of the lighters, and sent up to *Amsterdam*, and there put into the king's stores; but in whatever way the goods were sent to *Amsterdam*, they never came to the hands of the consignees.

Again, it is said that the defendants are not answerable, because the cargo might have been sent in another vessel, or in the lighters, to *Bremen*. As soon as the technical total loss happened by the perils of the sea, the plaintiffs had a right to abandon and recover, unless the defendants can show, affirmatively, that the goods might have been transported in another vessel. That is ground of defence for them. The *onus probandi,* as to that fact, lies on them, not on us. They must show that the lighters were sufficient to transport the goods, or that other vessels might be obtained. A stranding, followed by shipwreck, is a technical total loss, because it breaks up the voyage.

In the case of *Goold* v. *Shaw*, the insurance was on the ship, which was repaired, and performed the voyage, and the only point decided was, that the underwriter on the ship should not be answerable for the nature of the cargo, which might render a sale necessary at an intermediate port. In *Green* v. *Elmslie*, the vessel had received no damage from sea risk, but had been driven on the enemy's coast; and the court said that had she been driven on any other coast she would have been in perfect safety. And in *Levie* v. *Janson*, Lord *Ellenborough* goes on the ground of a partial loss. The stranding, in that case, was not followed by *shipwreck;* for the vessel was got off. These cases do not, therefore, apply to the one now before the court. A shipwreck is where a vessel is so injured as to be rendered innavigable, or incapable of proceeding on her voyage, or where the expense of repairs would exceed half her value. It is not necessary that the loss should be the immediate and direct consequence of the accident.

ALBANY,
Jan. 1812.

SCHIEFFELIN
v.
NEW-YORK
INS. CO.
* Jones v
Schmoll, 1
Term Rep.
159. in note..

It is enough, if it can be fairly attributed to the peril which has happened.*

The stranding and shipwreck produced a technical total loss; and had the parties been on the spot, the plaintiffs might have immediately abandoned. What was done, afterwards, was done for the defendants, by persons acting for their benefit.

KENT, Ch. J. delivered the opinion of the court. There is no proof, in this case, that the goods were damaged to the amount of a moiety of their value, or to any considerable extent, by the stranding and loss of the ship. If the claim for a total loss can be supported, it must be on account of the loss of the voyage. The evidence does not warrant any suggestion that there was an acceptance of the cargo by *Field*, as the authorized agent of the shippers. But it has been strongly contended, that the loss was to be imputed to the seizure by the *Dutch* government; and if this was so, the defendants are not responsible, inasmuch as the insurance was against " the dangers of the seas only." There are two points of view in which the seizure may be considered as the cause of the loss ; 1. As being the proximate and efficient cause which absorbs all inquiry into the previous loss by the stranding of the ship; and, 2. As destroying the power, otherwise existing, of the captain to forward the goods by another vessel. The counsel, upon the argument, dwelt principally upon the former mode in which the seizure operated; but I think the loss is rather to be imputed to the seizure, in the last point of view. The seizure would seem not to affect the case, if the loss was total prior to its taking place. ( An abandonment, when founded upon a statement of facts justifying it, relates back to the time of the loss, and renders the insurer proprietor of the subject from that time, with the rights and risks attached to that relation. ) (2 *Emerigon*, 196. 235.) If a loss ceases to be total, when the abandonment is actually made, as in the case of a capture and subsequent restoration, the rights of the parties will be determined by the state of things existing at the time of abandonment. But the previous loss of the voyage in this case, if such a loss had actually happened, did not the less continue to exist after the seizure.

In cases of partial loss, followed by a subsequent total loss, the former may properly be considered as merged in the latter, and the authorities which were cited to this point, of *Green* v. *Elmslie*, (*Peake's Cases*, 212.) and *Levie* v. *Janson*, (12 *East*, 648.) were cases of that description. But these cases do not apply when the

first loss is, in judgment of law, total. If a succession of perils ensue, and the first, in the order of time, produces only a partial injury, every one must concur in the good sense of the observation of Lord *Ellenborough*, that " we are not to be seeking about for odds and ends of previous partial losses, when, at last, there was an overwhelming cause of loss which swallowed up the whole subject matter." But suppose the policy was against capture only, and the vessel was captured and then shipwrecked, while in the hands of the captor, I should think the assured would have a right to abandon, and to maintain that his right to recover, as for a total loss, attached upon the capture, and that the subsequent casualty was one with which he had no concern. When the first loss is distinct, and so far total as to justify an abandonment, which is accordingly made, and there is no after recovery to defeat it, the rights of the parties are fixed, and we are not to be casting our eyes forward to see what further perils awaited the property. Those inquiries belong to the insurer, in whom the residuary interest has vested.

The case is then brought to this point; was here a loss of voyage, by the loss of the vessel, so as to authorize the demand for a total loss ? There undoubtedly was, if we lay out of view the seizure, and admit that the goods could not have been forwarded by any other vessel. But the master ought to have provided other means to send on the cargo, if he had it in his power; and if he can and will not, it would seem to be the better opinion that the insurer is discharged.

In *Manning* v. *Newnham*, (*Park*, 221. 6th edit. 2 *Campbell*, 624. *note*, S. C.) there was an insurance on ship, cargo and freight, and after the voyage was commenced, the ship was so disabled by the perils of the sea, that she put back in distress, and could not proceed nor be repaired, nor could any other vessel be procured to take on the cargo. The assured, therefore, recovered for a total loss, by reason of the loss of the voyage. Lord *Mansfield*, in giving the opinion of the court, laid stress upon the fact, that there was no other ship to be had, and his opinion evidently implies, that if another vessel could have been procured, it would have been the duty of the master to have forwarded the cargo, and the assured would not have been entitled to recover a total loss upon it. If the captain has other means to forward the cargo, and save the voyage, and earn the freight, he ought to do it. What *may* be done, *ought* to be done, when the rights of third persons are essentially concerned in the act. The

ALBANY,
Jan. 1812.

SCHIEFFELIN
v.
NEW-YORK
INS. CO.

master is bound to act for the best interest of all concerned.   He is the agent of the assured until an actual and valid abandonment, and they ought to bear the consequences of his neglect if the voyage be thereby lost, unless barratry be the cause of that neglect. The late case of *Wilson* v. *The Royal Exchange Assurance Company*, (2 *Campbell's N. P.* 623.) which was tried before Lord *Ellenborough*, is a direct authority on this point.   That was an insurance upon a cargo of wheat from *London* to *Lisbon*, and the ship was disabled after the voyage had begun, and could not be repaired, without an expense much greater than her entire value. The demand was for a total loss, on account of the loss of the voyage; but as it appeared that there was another vessel lying at *Dover*, where the injured ship lay, in which the cargo might have been forwarded, his lordship held that the plaintiff could not recover.

It may be a question whether it belongs to the plaintiffs, in such cases, to show that another vessel could not be had.   The circumstances of each case may, perhaps, be sufficient to turn the presumption on the one side or the other; but, as a general rule, it belongs to the plaintiff to make out a complete case, and his case is not complete, unless it appear that the voyage was lost by a peril within the policy.   It is not lost, as to the ship, if he has the means to repair her; nor as to the cargo and freight, if he has the means in his power to send on the one, and to earn the other. But in this case, as the cargo lay in the midst of vessels, at the *Texel*, or was in the neighbourhood of *Amsterdam*, and as the seizure formed at once an insuperable obstacle, the omission to forward the cargo must be imputed to the seizure.   Nothing short of proof of diligent inquiry, and fruitless exertions to procure means, could rebut this presumption.   When one sufficient cause for the omission appears affirmatively, we are not to be searching for latent ones.

The small partial damage which the cargo sustained by sea perils previous to the seizure, is not to be regarded; for here the doctrine in *Levie* v. *Janson* properly applies.   There was no total loss of any distinct portion of the cargo.   "Fifty hogsheads of sugar were found to be damaged by sea water, and part of the sugar had dissolved and run out, and a part of the drugs was also damaged."   But the extent of the damage is not stated, and cannot now be ascertained.   It may have been one or more entire hogsheads, or only a small proportion of the contents of each.   The subsequent total loss by seizure has closed these inquiries.

The court are, accordingly, of opinion, that the voyage was lost by the seizure preventing the captain from sending on the cargo, and that the defendants are entitled to judgment.

Judgment for the defendants.