CHAUNCEY D. SPAIDS *v.* THE NEW YORK MAIL STEAMSHIP COMPANY.

A capture, by public enemies, of the property entrusted to a common carrier, releases him from all further obligation respecting it, for that act puts it out of his power to do what he engaged to do.

But where it appears, in an action for loss of baggage, that the enemy limited his capture to the vessel, and expressly permitted the passengers to take with them their baggage, and the captain of the captured ship took charge of, and undertook to transfer the passengers' baggage to a schooner provided by the enemy, to bring the passengers and their effects to port, and that the baggage was not brought on board the schooner, but was lost: *Held,* that it was no capture of the baggage, and that the carrier's liability continued.

*Held further,* that the fact that the defendants were neither the owners nor the charterers of the captured vessel, but had merely placed her on their line temporarily, charging and receiving a commission as agents on the freight and passage money, did not affect the question of their liability in such case.

APPEAL by the defendants from a judgment of the Marine Court in an action tried without a jury.

The action was brought to recover the value of plaintiff's baggage, on board the "Electric Spark," at the time of her capture by the Confederate cruiser "Florida."

The plaintiff, in July, 1864, engaged passage from the defendants from New York to New Orleans by the steamer "Electric Spark." This vessel did not belong to the defendants, but was placed by them on their line to take the place of one of their own vessels temporarily disabled, they charging a commission as agents for her on the freight and passage money.

The "Electric Spark," with the plaintiff and his baggage on board, left New York on the ninth day of July 1864; on the tenth or eleventh of July the vessel was overhauled and captured by the armed steamer, called the "Florida," a cruiser sailing under the flag and claiming to be commissioned as a ship of war by the chiefs of the rebellion against the United States' authority, then in progress.

The officer in command of the "Florida" immediately upon taking possession of the "Electric Spark," informed the captain of the latter vessel that the personal effects of the passengers would not be interfered with, but might be taken on board of a schooner, which the "Florida" took possession of and chartered for the conveyance of the passengers and baggage from the "Electric Spark."

The baggage was all collected on the deck of the "Electric Spark," near the gangway. The plaintiff brought up his own and his wife's trunks, and pointing them out to the captain, expressed a wish to take them with him. The captain said this could not be permitted, as the passengers must go first, and the baggage afterwards, and that he (the captain) would be responsible for it. All the baggage, except that of the plaintiff and his wife, was safely transferred to the schooner, and subsequently delivered to the owners. The plaintiff's was not. There was no evidence to show that the officers or crew of the "Florida" interfered to prevent the safe transfer of the baggage, nor was its loss in any way accounted for by the defendants. The justice, before whom the action was tried, gave judgment for the plaintiff, from which judgment, as affirmed by the general term of the Marine Court, the defendants appealed to this court.

*Brown, Hall & Vanderpoel*, for appellants.

I. The voyage of the "Electric Spark," and the contract to carry the plaintiff, terminated with the capture. By capture all contracts and all liens are determined. The carrier is, by the capture, deprived of the means which, in the contemplation of both parties, were to enable him to perform his contract. The contract is, therefore, extinguished by the common misfortune, and it has therefore been adjudged that the voyage terminates with the capture by a *hostile power*, and the contract is dissolved. *The Hiram*, 3 C. Rob. Ad. R. 180 ; 3 Kent. Com. 349 ; *Palmer* v. *Lorillard*, 16 Johns. 348 ; *The Friends*, 4 C. Rob. 144 ; *Lemon* v. *Walker*, 9 Mass. 404 ; *Arfridson* v. *Ladd*, 12 Mass. 173.

II. It is well settled that a lawful capture transfers the property captured to the captors, as between the belligerents, immediately upon the capture. *Miller* v. *The Resolution*, 2 Dallas, 1, 2, 4; *McDonough* v. *Dannery*, 3 Dallas, 188, 198; *The Adventure*, 8 Cranch, 226. And, in order to complete the capture, it is not necessary that the prize should be carried within the territory of the captors, and there condemned. *Moxon* v. *The Fanny*, 2 Pet. Adm. 309. The appellants were merely agents, having no interest in the "Electric Spark." This action, if it could be maintained against any party, could only lie as against the owners.

*Lewis S. Thomas & Samuel J. Glassey*, for respondents.

The burden of proof is upon the carrier, who must show *first*, that the *particular loss* complained of was caused by the "act of God or the public enemy;" *second*, that he was entirely free from blame—*i. e.*, that he neither contributed, by any fault or negligence, to the occasion of the loss or injury, nor failed to make all possible exertions to prevent or lessen the injury. *McArthur* v. *Sears*, 21 Wend. 190; *Read* v. *Spaulding*, 5 Bosw. 395; *Michaels* v. *N. Y. Central R. R. Co.*, 30 N. Y. 564. That "the relation of the seaman to the ship ceases on the capture, and their duty as such to it ceases," *is not* held in any of the cases cited by defendants, and the contrary is expressly decided by the Supreme Court of the United States, in the case of the *Eleanor*, 2 Wheaton R. 243. To constitute a valid capture, some act should be done indicative of an intention to seize and retain as prize. *The Grotius*, 9 Cranch. 368. After capture, it is the duty of the carrier to do all in his power to save the goods from condemnation in a Prize Court (*Cheviot* v. *Brooks*, 1 Johns. 364).

By the Court.—DALY, F. J.—The finding of the justice is conclusive in respect to every matter of fact upon which the testimony was conflicting, and, applying this rule in every part of the case where there was any conflict, we must assume that he found the following to be facts: The order given by

the commander of the Confederate privateer the "Florida," was that the propeller the "Electric Spark" was to be considered as the prize of the "Florida;" but that the personal effects of the passengers would be respected, and might be taken with them upon their leaving the propeller, for all the captors wanted, as declared by the lieutenant of the privateer, was the vessel and her cargo. A schooner was provided by the captors for the transportation of the passengers and their baggage to a port in the United States, and their transfer to this schooner was carried on with the captors' consent, exclusively under the direction and control of the captain of the "Electric Spark." He told his passengers that he wanted all of them to go on board the schooner; that he would take care of their baggage; that he would see that it was brought on board of that vessel, and the passengers did as he directed them to do. When nearly all of them had left in the boats for the schooner, the captain asked the plaintiff why he did not go, and the plaintiff said he would rather wait and go with his baggage; but the captain told him he must go in the boat that was alongside, and that he would see that the plaintiff's baggage was brought safely on board the schooner. The plaintiff asked him if he knew the baggage, and upon the captain's answering that he did, the plaintiff said to him, "This is it," placing, at the same time, his hand upon his trunk and valise, which were together upon the deck, and saying, "Will you positively see that it comes safely on board?" and the reply of the captain was that he would, upon which the plaintiff left in the boat for the schooner. No one but the captain of the "Electric Spark" gave any direction in relation to the transfer of the passengers and their baggage. There was no Confederate officer at the gangway during the embarkation, nor did any one connected with the privateer give any direction except that the mails were to be retained, and, to prevent their being taken away, a coxswain of the privateer was stationed at the gangway. The captain was under the influence of liquor. In the language of a witness, he was inflated and very boisterous, drinking from the time of the capture until the plaintiff left, a great deal more than the witness thought

"one man could carry." The plaintiff's baggage was not brought on board of the schooner. When the captain came on board of her, the plaintiff informed him of the fact, and he went back with the plaintiff to the propeller, and to the privateer, and searched for the baggage. It could not be found. The plaintiff, the captain, and the other passengers then returned in the schooner to New York.

It is a well settled rule that a capture by public enemies of the property entrusted to the carrier releases him from all further obligation respecting it, for that act puts it out of his power to do what he engaged to do, and, being an act entirely beyond his control, he is not answerable for the consequences growing out of it. But in this case the act was limited to the capture of the vessel and her cargo. There was no capture of the baggage of the passengers, nor any intention to capture it, and there must be a manifest intention to seize and retain as prize, to constitute a capture (Halleck on the Laws of War, c. xxx, § 1). Such being the fact, and the captors having furnished means for the transportation of the passengers and their baggage to the United States, it was incumbent upon the captain, in the discharge of his duty, to do what he could, under the circumstances, for their safe return and for the preservation of the property they were permitted to take with them. The voyage was broken up, but that did not necessarily terminate the relation in which he stood to his passengers, while anything remained to be done, which he was permitted to do, for their security and safety. It was held, in *Cheviot* v. *Brooks* (1 Johns. R. 364), that the duty of the master, in respect to the protection of the property, did not cease with the capture, and that it was obligatory upon him to rescue it from condemnation, by interposing for the protection of the property; and in consonance with the same principle, it is the law, that where a vessel is stranded by the perils of the sea, the obligations of the master and owners do not terminate with the catastrophe, but, on the contrary, that they are bound to make proper exertions for the saving and preservation of the cargo; for its transshipment, if practicable, to the place of destination, and, if not, for its safe deposit and return to the owner, as far as it can be done

(*Faulkner* v. *Wright*, 1 Rice, S. C. 107; *Treadwell* v. *The Union Ins. Co.*, 6 Cow. 270; *Schieffelin* v. *The New York Ins. Co.*, 9 Johns. 21; Angel on Carriers, § 187). "What may be done," says Woodworth, J., in the second case above cited, "ought to be done;" and if loss or injury arises from a neglect to do it, the master and owners are responsible.

This is not only the law, but the master, in this case, understood it to be his duty to see that his passengers and their baggage was safely transferred from the captured propeller to the schooner. He assumed entire control of the matter, and was allowed by the captors to do so. A Confederate officer said repeatedly to the passengers, "Take all your baggage." When the plaintiff had the conversation with the master, above detailed, a Confederate officer was standing by, but he did not interfere or assume to give any direction. The master was at full liberty to discharge the duties which were incumbent upon him under the circumstances, and for that purpose he was left to the free exercise of his authority. He exercised his authority by telling the passengers what they must do, and they obeyed his orders. He prevented the plaintiff from taking his baggage with him, directing him to go in a boat without it, having ordered, very properly no doubt—for there was a heavy sea at the time—that the passengers should go first in the boats to the schooner, and that the baggage should be brought to her afterwards under his superintendence. But for this exercise of his authority, and the entire control which he assumed in the matter, the plaintiff would have waited and taken charge of his baggage himself. He stood by his trunk and valise for more than an hour, and objected to going without his baggage, but the captain told him that he must go in the boat that was then alongside, and he obeyed. It was his duty to do so. The sea was running so heavily at the time that the passengers had to be assisted in getting out of the boats into the schooner, and it was not for him, but for the captain, to determine how the passengers and baggage should be transferred from one vessel to another. "The master of a ship," says Angel, "is an officer to whom great power, momentous interests, and enlarged discretion are necessarily confided, and the situations of unforeseen

Spaids v. The New York Mail Steamship Company.

emergency in which he may be compelled to exert himself for the preservation of the life and property with which he is en- trusted on the voyage, render it necessary that he should be invested with large, and, for the time, unfettered authority, and obedience to this authority, in all matters within its scope, is a duty expected from every passenger" (Angell on Carriers, § 621). But it has been urged here that the captain's authority and duty were at end when the vessel was captured, and that what he assumed to do afterwards, in the transfer of the baggage from one vessel to another, was simply as a voluntary bailee, and not as the agent or representative of the owners, in his official char- acter as master.   This view cannot be maintained.   All further obligation and duty, on the part of a carrier of passengers upon the high seas, is at an end when the peril encountered is of so overwhelming a nature as to put it beyond his power to do anything further for their carriage, or for their security and safety, or for the preservation of their property.   But such was not the case here.   It was in the power of those in the hostile cruiser to have taken all the property of the passengers and to have made prisoners of them; but they did not do so.   They not only left them at liberty, but procured and paid for a vessel to bring them back to New York, and allowed them to take their effects with them.   What then remained to be done was to transfer them, with their effects, from the captured vessel to the schooner, an act to be done upon the ocean, whilst a heavy sea was running, and which necessarily involved the exercise of care and skill, that they might be safely transferred, with their effects, from one vessel to the other.   By whom was it to be done?   The captors simply provided a vessel to receive them, and allowed them to take their property with them.   Were they to be left to get on board the schooner in the best way that they could, or was it not the plain duty of the master to give them all the aid which his knowledge and experience would enable him to afford and which it was in his power to render?   This is to be implied from the nature of the contract.   A carrier of passengers by land or water is bound to the observance of the utmost care for the safety of the passengers.   Not ordinary, but extraordinary care.   He does not warrant their safety, but un-

dertakes, as far as human care and foresight will go, to provide for it (*Christie* v. *Greggs*, 2 Camp. 80; *Stokes* v. *Saltonstall*, 13 Peters' U. S. R. 181; *Ingalls* v. *Bills*, 9 Met. R. 1). The helpless state in which passengers are, says Angell, has induced the courts to bind the contract *locatio operis*, much tighter than could be insisted upon, under the ordinary principles of the contract (Angell on Carriers, § 568). It matters not, therefore, what may be the nature of the peril encountered, whether it be capture or shipwreck, that leads to the breaking up of the voyage and the loss of the vessel, the duty of looking after the safety of the passengers and their effects continues as long as a state of circumstances exists which calls for the exercise of it, and it is in the master's power to discharge it. There was nothing in the capture of the vessel which released the master or his employers from this obligation, as something remained to be done to secure the safety of the passengers and their baggage, which the master was left by the captors at liberty to do, and which called for the exercise of his care, experience, and skill. He himself so interpreted his obligation. Understanding it to be both his duty and his right, he took the sole direction. He undertook to do, as the agent of the owners, what the law imposed upon them, in the faithful fulfillment of their contract, and did it so inefficiently, that, through his neglect and want of care, the plaintiff lost his baggage. The judgment should be affirmed.

Judgment affirmed.