[No. 6,844.—In Bank.]
May 26, 1882.

AUGUST SCHROEDER ET AL. v. SCHWEIZER LLOYD TRANSPORT VERSICHERUNGS GESELLSCHAFT.

MARINE INSURANCE—CHANGE OF SHIP—TRANSSHIPMENT OF CARGO.—It is an implied condition of a policy of marine insurance that the ship named in it shall not, after the commencement of the risk, be changed without necessity or the consent of the underwriters; for such unnecessary or unsanctioned change of the ship would produce an alteration of the risk run by the underwriters, and therefore exempt them from their liability.

ID.—ID.—ID.—CONNECTIONS.—Plaintiff's wheat was insured by the defend-
ant on the steamer *Colorado* and *connections.* The customs and usage of
the steamship company, with reference to cargoes to Hong Kong and Ba-
tavia, was for the ship taking the cargo at San Francisco to carry the
same to Hong Kong without transshipment; but in this case the cargo
was transshipped in Yokahama (without necessity,) to other ships of the
Company, and by them carried to Hong Kong where it was lost.
    *Held :* The "*connections*" referred to in the policy were the regular con-
    nections of the company only, and the term was not intended to include
    a casual, unusual and unanticipated connection with a ship substituted
    for the occasion upon a state of things temporary in its nature, and un-
    known at the time that the contract was made. The loss at Hong-
    kong occurred subsequent to the change of ship, and under the terms of
    the policy the defendant was not responsible.
APPEAL—REVERSAL OF JUDGMENT—NEW TRIAL—PRACTICE.—Extreme
caution ought to be exercised in refusing new trials where judgments are
reversed. The discretion of the appellate Court should be exercised in
that direction only in cases where it is plain, either from the pleadings
or from the nature of the controversy, that the party against whom the
reversal is pronounced cannot prevail in the suit.
    *Held,* accordingly in this case (THORNTON, J., dissenting), that the cause
    should be remanded for a new trial.

APPEAL from a judgment for the plaintiffs and from an
order denying a new trial.

*Milton Andros* and *Charles Page,* for Appellant.

The general rule is, that the right to tranship cargo from
the original vessel does not exist, except in case of some ac-
cident to that vessel which renders her innavigable, or with
the consent of the shipper, or, in case it is insured, with that
of the underwriter. (1 Arnold on Ins. 331; Lees' Laws of
Shipp. and Ins. 412.) The rule as above stated is recognized
not only in the earliest laws of the sea, but has continued to
be down to the present time. (Emerigon on Ins. 339; Or-
donnance de la Marine, Liv. III, Tit. 6, § 27; Marshall on Ins.,
Book 1, Chap. 7, § 3; Chap. 11, § 2; 2 Parsons on Ins. 2;
Park on Ins. 611; 1 Phillips on Ins. § 983; Hildyard on Ins.
139; *Pierce* v. *Columbian Ins. Co.* 14 Allen, 320; *Bold* v.
*Rotheram,* 8 Ad. & El. N. S. 797; *Paddock* v. *Commercial
Insurance Co.,* 2 Allen, 93–100; *Trott et al* v. *Wood,* 1 Galli-
son, 442.)

It is from the use of the word "connections" only, that
such consent if given, is to be implied. This word, when
construed in connection with the usage stated in the tenth

finding, as it must be, raises no implication of such consent, but, on the contrary, negatives the proposition that the underwriter consented to or contemplated a transshipment at Yokohama.

The word "connections" is general and indeterminate, and its meaning may be explained by the known usage of the Pacific Mail Steamship Company, with reference to the usual and customary course pursued by its line of steamers plying between San Francisco and Hong Kong, and carrying cargo destined to that port or Batavia. (1 Duer on Ins., 195, § 42; *Coit* v. *Commercial Ins. Co.*, 7 Johns. 385; S. C., 7 Am. Dec. 282; *Houghton* v. *Gilbart,* 7 C. & P. 701; 1 Phil. on Ins., § 137 *et seq.; Astor et al.* v. *Union Ins. Co.*, 7 Cow. 202; *Dow* v. *Whetten,* 8 Wend. 160; 1 Park on Ins. 89; 2 Phil. on Ev. (Cow. & Hill's Notes), 724; *Brough* v. *Whitmore,* 4 Term R. 210; *Pelly* v. *Royal Exchange Ins. Co.*, 1 Burrow, 345; 1 Duer on Ins., 276, §§ 69, 70; id. 195, 196, §§ 42, 49, 44 *et seq.; Crosby* v. *Fitch,* 12 Conn. 422; 3 Addison on Cont., § 1158; 2 Parsons on Cont., 356, 535; 2 Phillips on Ev. 787, 788; *Preston* v. *Greenwood,* 4 Doug. 28, 32; 1 Park on Ins., 48, 49; *Clark* v. *United F. and M. Ins. Co.*, 7 Mass. 365, 369; S. C., 5 Am. Dec. 50; *Loring* v. *Neptune Ins. Co.*, 20 Pick. 411, 414; 1 Duer on Ins. 179, § 31; 184, § 34; *Consequa* v. *Willings,* 1 Pet. C. C. 225, 229, 230; Abbott's Trial Evidence, 485; 2 Duer on Ins., 668, 669, § 17: 6; *Lowry* v. *Russell,* 8 Pick. 360, 362; *Van Santvoord* v. *St. John,* 6 Hill, 157 ; *F. and M. Bank* v. *Champ. Trans. Co.*, 18 Vt. 131, 140 ; *Barksdale* v. *Brown et al.,* 1 Nott & McC. 517, 519; S. C., 9 Am. Dec. 720; *Vallance* v. *Dewar,* 1 Campb. 505, 506 ; Civil Code of Cal., §§ 1566, 1646, 1649 ; *Wadsworth* v. *Pac. Ins. Co.* 4 Wend. 34.)

*Sidney V. Smith & Son,* for Respondents.

A policy of marine insurance protects the insured property from loss by a peril insured against during the whole transit, on the land as well as upon the sea. (*Pelly* v. *Royal Exchange Assurance Co.,* 1 Burr, 341 ; *Boehm* v. *Combe,* 2 M. & S. 172 ; *Brough* v. *Whitmore,* 4 T. R. 206 ; *Coggeshall* v. *Ins. Co.,* 3 Wend. 283 ; *Devaux* v. *J'Anson,* 5 Bingh. N. C. 519 ; *Fletcher* v. *Ins. Co.,* 18 Mo. 193; *Dunlap* v. *Allen,* 9 Faculty Decisions, 371; *Underwriters' Agency* v. *Sutherlin,* 55 Geo. 266.)

The transshipment at Yokohama was provided for by the broad language of the policy, the words "connections" in its natural import including all transshipments, wherever made. (C. C. P. § 1861.) The principles of law in regard to deviation and change of risk have no application to this case. The language of the policy includes all connections of the *Colorado*, even one which might be a departure from the usage of the steamship company. Proof of that usage could, therefore, affect the express stipulations of the contract. (1 Arn. Ins., §§ 44, 45; 1 Phil. Ins. § 980; C. C. P. § 1870, par. 12; *The Schooner Reeside*, 2 Sumn. 567; *Blackett* v. *Assurance Co.*, 2 Cr. & J. 244.) There is nothing in the case to show that the usage of the steamship company was known to the community or understood by the plaintiffs; but proof of this sort is necessary to establish a usage which shall be taken to have been a part of the contract. (1 Arn. Ins., § 43; 1 Phil. Ins., § 135; 2 Pars. Mar. Law, 57.) The understanding of the insurer as to the point where the first transshipment would be usually or probably made can not qualify the terms of the policy. (*New York Fire Ins. Co.* v. *Roberts*, 4 Duer. 141; *Armett* v. *Innes*, 4 J. B. Moore, 150; *Hunter* v. *Leathley*, 10 B. & C. 858.)

The language of the policy, being unambiguous, can not be controlled by proof *aliunde* of its meaning. The explicit word "connections" is not open to explanation. (1 Arn. Ins., § 137, p. 361.) All doubt as to the meaning of the words "perils of the sea" or "connections," and as to the construction of the limitation of the insurer's liability to total loss only, is to be resolved in favor of the insured and against the insurer. (1 Duer on Ins., 161; *Wilkins* v. *Ins. Co.*, 30 Ohio St. 317; *Palmer* v. *Ins. Co.*, 1 Sto. 360; *Hoffman* v. *Ins. Co.*, 32 N. Y. 413; *Ins. Co.'s* v. *Wright*, 1 Wall. 468; C. C. § 1654.)

*Sidney V. Smith & Son*, for Respondents. (Rehearing in Bank.)

Department No. 2 ordered judgment to be entered in favor of defendant.

We think that under the circumstances of the case more complete justice would be done by granting a new trial, and the propriety of granting a new trial is the only point which we desire to present by this petition.

That the granting of a new trial upon the reversal of a judgment is within the discretion of this Court, follows from the language of Section 53 of the Code of Civil Procedure. (*Argenti* v. *San Francisco*, 30 Cal. 463 ; *Ryan* v. *Tomlinson*, 39 id. 464).

In New York, under a statute similar to our own above cited, it has been held that the granting of a new trial upon reversal was discretionary with the appellate Court, and that to order the new trial was a better exercise of discretion than to order judgment to be entered against the winning party in the Court below. (*Griffin* v. *Marquardt*, 17 N. Y. 28 ; *Corning* v. *Troy Iron and Nail Factory*, 34 Barb. 485 ; *Burk-hardt* v. *McClellan*, 1 Abb. App. Dec. 266 ; *Foot* v. *Aetna Life Ins Co.*, 61 N. Y. 577 ; *Enrichs* v. *DeMill*, 75 id. 374 ; *Ed-monston* v. *McLoud*, 16 id. 543 ; *Guernsey* v. *Miller*, 80 id. 183.)

Ross, J.:

The opinion delivered by Department Two in this case is here approved and adopted, but we think that instead of directing judgment to be entered for the defendant on the findings, the cause should be remanded for a new trial.

The power so to do is expressly conferred on the Court by Section 53 of the Code of Civil Procedure, which declares : "The Supreme Court may affirm, reverse or modify any judgment or order appealed from, and may direct the proper judgment or order to be entered, or direct a new trial or further proceedings to be had." * * * (See also *Argenti* v. *The City and County of San Francisco*, 30 Cal. 463 ; *Pollard* v. *Putnam,* 54 id. 630.)

Of course this power must be exercised in a proper case ; and the appellant here contends, as was contended in *Enrichs* v. *DeMill*, 75 N. Y. 375, that as the findings of fact were not excepted to, they are to be taken as absolutely true, and as assented to by both parties. But to this we answer, as did the Court of Appeals of New York, in the case cited, that it must be remembered that the plaintiff obtained judgment in the trial court upon the findings as they stood, and was not called upon to except to them, or to insert the evidence in the case to show that they were controverted. And we also agree with

the same Court, where it says, in another case—*Griffin* v. *Marguardt*, 17 N. Y. 28—" that extreme caution ought to be exercised in refusing new trials where judgments are reversed. The discretion of the appellate Court should be exercised in that direction only in cases where it is plain either from the pleadings or from the nature of the controversy, that the party against whom the reversal is pronounced, cannot prevail in the suit."

In the present case, the counsel for the respondent asserts that when the findings were settled they objected to the finding in respect to the custom and usage of the Pacific Mail Steamship Company with reference to the voyages of their steamships between San Francisco and Hong Kong, and that if judgment had been against the plaintiff, they would have impeached it by bill of exceptions, bringing up the evidence. As that usage and custom is an important fact in the case, we are of the opinion that the cause ought to be remanded for a new trial.

Judgment reversed and cause remanded for a new trial.

MORRISON, C. J., and McKEE, MYRICK, and SHARPSTEIN, JJ., concurred.

THORNTON, J., dissenting:

I dissent as to the reversal of the judgment. The case cited from N. Y. has no application. The case of *Gay* v. *Moss*, 34 Cal. 135, is substantially overruled by the judgment here. I adhere to the opinion drawn up by me when the case was before Department Two.

The following is the decision of Department Two referred to:

THORNTON, J.:

This is an action on a policy of insurance to recover for a loss of three thousand nine hundred and fifty-one sacks of wheat, shipped by the plaintiffs with other wheat in sacks at San Francisco, and destined for Batavia.

The cause was tried by the Court, judgment was rendered for the plaintiffs, from which defendant appealed.

All the facts appear in the decision of the Court below, which was as follows:

"The above entitled action came on to be tried by the Court, a jury having been expressly waived by the parties on the twenty-third day of July, 1879, and now the Court, having considered the pleadings and the evidence, finds the following to be all the facts of the case:

"1. On the twelfth day of August, 1874, the defendant, a corporation, issued and delivered to one J. W. H. Campbell, on behalf of the plaintiffs, who were then and are now doing business under the firm name of Busing, Schroeder & Co., the the policy of insurance, a copy of which is attached to the complaint.

"2. Subsequently, before the commencement of this action, said policy was assigned and transferred to plaintiffs, who at the commencement of this action were, and are now, the legal owners and holders thereof.

"3. On said day plaintiffs shipped on board the steamship *Colorado*, then in the harbor of San Francisco, and belonging to the Pacific Mail Steamship Company, the four thousand five hundred and fifty-one sacks of wheat mentioned in said policy, and which were during all the times mentioned herein, the property of, and owned by, the plaintiffs.

"4. The *Colorado* then proceeded to Yokohama, where the master of said steamship received instructions from said company to return to San Francisco, instead of going on to Hong Kong. The reason of these instructions was that the steamer *Alaska*, which should have sailed prior to that time from Hong Kong to San Francisco, was undergoing repairs at Hong Kong, and was unable to make the voyage and to carry the mails between said ports in the regular course of the business of said company. The agents of said company at Yokohama thereupon transshipped the said four thousand five hundred and fifty-one sacks of wheat from the *Colorado* into the steamships *Sierra Nevada* and *Costa Rica*, belonging to the company, by which steamships it was conveyed to Hong Kong.

"5. Six hundred of said sacks of wheat were thus placed on board the *Sierra Nevada*, and were by her and connecting steamers safely conveyed to Batavia.

"6. Three thousand nine hundred and fifty-one of said sacks of wheat, of the value of thirteen thousand eight hundred and eighty-seven dollars, were thus placed upon the *Costa*

*Rica* and were by her transported to Hong Kong, where they were received by the agents and servants of the said company and by them, as a matter of necessity, and in accordance with the established custom prevailing at Hong Kong, which was known to the defendants at the time of the issuance of the policy, placed and stored in a warehouse on the harbor front of Hong Kong, there to await the first opportunity to ship them to Batavia.

"7. While said three thousand nine hundred and fifty-one sacks of wheat were in said warehouse awaiting reshipment, and before any opportunity to ship them to Batavia had arrived, the said harbor of Hong Kong was visited by a typhoon, or storm of extraordinary violence, which drove the waters of the harbor up on to the land, so that they broke in the roof and windows of the said warehouse, drenched the said wheat with sea water, and flooded the interior of the warehouse to the depth of three or four feet.

"8. By reason of said flooding and drenching, the said three thousand nine hundred and fifty-one sacks of wheat were so thoroughly soaked with sea water and rain, that the wheat began at once to sprout, and became swollen and heated to such an extent that it would have been impossible to transport it to Batavia. No vessel would have received it on board, as there would have been danger during the voyage of its ignition from spontaneous combustion; and, if it had been been taken to Batavia, it would have arrived there as manure, and not as wheat.

"9. The said three thousand nine hundred and fifty-one sacks of wheat were thereupon surveyed by the Government surveyors at Hong Kong, and by their advice sold at public sale, for the sum of three thousand five hundred and forty-one dollars and ninety-two cents, on the twenty-second day of September, 1874.

"10. The custom and usage of the Pacific Mail Steamship Company, with reference to the voyages of their steamships between San Francisco and Hong Kong, with cargo laden for Hong Kong or Batavia, was for the vessel on which such cargo was taken at San Francisco, to carry the same to Hong Kong without transshipping it at Yokohama, at which port they touched or making connection with any other vessel or vessels,

at the last named port for such purpose. This usage had existed, without interruption, since the first day of January, 1867, the time of the establishment of the company's line of steamers between San Francisco and Hong Kong, the only instance of such transshipment being that of the cargo in question. The defendant had knowledge of this custom, and charged a lower rate of premium on the policy sued on, because it expected that no transshipment of the wheat was to be made at Yokohama.

"And from the foregoing facts the Court now finds the following to be its conclusions of law:

" 1. The said three thousand nine hundred and fifty-one sacks of wheat were, while in the warehouse at Hong Kong, insured and protected by the policy, from loss or damage by any of the causes enumerated therein.

" 2. The said three thousand nine hundred and fifty-one sacks of wheat were totally destroyed.

" 3. The cause of the destruction of said three thousand nine hundred and fifty-one sacks of wheat was a peril of the sea.

" 4. The transshipment of the wheat from the Colorado, at Yokohama, was justified by the circumstances and by the policy and contract of the parties, and did not avoid the policy.

" 5. The division of the four thousand five hundred and fifty-one sacks of wheat, and the putting of part of it on one vessel, and part of it on another vessel, were justified by the circumstances, and by the policy and contract of the parties, and did not avoid the policy.

" 6. The total destruction of the three thousand nine hundred and fifty-one sacks of wheat was an absolute total loss, and not a partial loss or a particular average within the meaning of the policy.

" 7. By the policy, the wheat therein mentioned was not insured only during or upon the usual voyage performed by the steamers appertaining to said company, from San Francisco to Hong Kong, but was insured while it should be upon said *Colorado* or any other steamer with which the *Colorado* might anywhere connect, or to which she might anywhere transfer her cargo.

" 8. The ' connections' in said policy of insurance mentioned

was not a connection in the first instance, to be made at the port of Hong Kong, by and between said steamship *Colorado* and some other vessel, but included the connection which was made by the *Colorado* with the *Sierra Nevada* and the *Costa Rica* at Yokohama.

" 9. The plaintiffs are entitled to recover from the defendant the said value of the said three thousand nine hundred and fifty-one sacks of wheat, less the amount for which they were sold, with interest thereon at the rate of ten per cent per annum, from the twenty-second day of September, 1874, up to the sixteenth day of April, 1878, and from that date at the rate of seven per cent per annum, amounting in all to the sum of fifteen thousand and seventy-one dollars and forty-one cents."

The policy was made part of the findings of fact by reference to it as attached to the complaint.

The wheat was insured at and from San Francisco to Batavia on board the steamer *Colorado* and *connections*, against perils of the seas, fires, pirates, etc.

As appears in the findings of fact, the wheat was shipped on the *Colorado* in the harbor of San Francisco and it then proceeded to Yokohama, where the ship-owner transshipped the wheat from the *Colorado* to the steamships *Sierra Nevada* and *Costa Rica*, belonging to the same owner, by which it was carried to Hong Kong.

This change was made, not from the fact that the *Colorado* had been in any way disabled or rendered unnavigable, or with the consent of the insurer, but from the fact that when it reached Yokohama the master received instructions from the owner to return to San Francisco instead of going on to Hong Kong (see fourth finding, where the fact is found, and the reason that these instructions were given to the master.)

It is contended that this transshipment was unjustifiable, and its effect was to change the risk, and, in consequence, the defendant insurer was discharged from its contract. If the contract was thus changed the defendant cannot be held liable. "It is an implied condition of the policy that the ship named in it, should not, after the commencement of the risk, be changed without necessity or the consent of the underwriters; for such unnecessary or unsanctioned change of the

ship would produce an alteration of the risk run by the underwriters, and, therefore, exempt them from their liability." (1 Arnould on Ins., 177.) The author cites Emerigon, ch. xii, § 16, vol. 1, 419, 425, ed. of 1827, and *Pothier Traite d'Assurance*, Nos. 68, 69, 70, 71.)

As to insurance on goods, freight, profits, etc., the same author says: "That if either before the commencement of the voyage or during the course of it, the ship named in the policy be changed without necessity, or without the consent of the underwriters, they will be discharged from liability." (1 Arnould on Ins., 178.)

The author then proceeds and gives a reason for the rule:

"So invariable is this rule, that it holds good even though the substituted ship may be of larger dimensions or greater strength than that originally named in the policy, for by the fact that a given ship is named in the instrument, the underwriter has a right to say that he had some peculiar reasons for insuring a risk on that very ship, which should not apply to any other.

"On the same ground, if without consent or necessity, the cargo is either shifted from the ship named in the policy to one as good or better, or is originally loaded on board of the latter instead of on board the ship named, and both ships perish on the voyage, yet the underwriter shall be discharged from all liability, for the policy never attached upon the goods loaded on board the substituted ship." (Id. 178; 2 Pouson's M. Law, 276; *Bold* v. *Rotheram,* 8 Q. B. 781; *Winthrop* v. *Union Ins. Co.,* 2 Wash. C. C. 7, 20.)

If, however, the underwriters consent, or if the ship in the course of the voyage becomes so disabled as to be incapable, by any means at the master's disposal of being repaired at all, so as to take on the cargo, the master may procure another ship in which to forward the cargo to its port of destination, and the liability of the underwriters of the goods, will still continue ; and they will be liable for any loss occurring subsequent to the transshipment. (Id. 179; See *Plantamour* v. *Staples,* 1 Term. Rep. 611; Note, S. C. 3 Dougl. 1; *Schieffelin* v. *N. Y. Ins. Co.* 9 Johns. 21 ; 1 Phill. Ins., 485–6 ; *Treadwell* v. *Union Ins. Co.,* 6 Cowen, 270; *Saltas* v. *Ocean Ins. Co.,* 12 Johns. 107; S. C., 7 Am. Dec. 290; Abbott Ship., 6 Am. ed.

365, Notes; 3 Kent, 5 ed. 257. See also Lee's Law of Shipping and Insurance, 412.)

The necessity which will justify such action on the part of the master, only arises in case the ship is disabled by stress of weather, or other peril of the sea, from carrying on the goods to the place of destination. (Lee's Law of Sh. and Ins., 412; Arnold on Ins., 185; *Shipton* v. *Thornton*, 9 Ad. and Ellis, 336.)

No such necessity appears in this case. The facts in relation to the transshipment appear in the fourth finding, and they were not sufficient to justify it.

But it is contended that such consent is implied and was given by the use of the word " *connections* " in the policy— the underwriters stipulating for indemnity as regards the steamer *Colorado* and its connections.

If such is the significance of this word, the change of ship is justified. This word is simple and clear in its meaning. It indicates the act of connecting with some means of carriage or forming a junction with such means. (See Webster's and Worcester's Dictionaries, word " connection.")

It is evident that the contract of insurance was entered into with regard to a state of things as to the connections of the ship *Colorado* existing at the time of the execution of the policy. Reference certainly was not made to a casual, unusual and unanticipated connection with a ship substituted for the occasion, upon a state of things temporary in its nature and unknown at the time that the contract was made. It surely was not in the mind of either of the contracting parties that the *Colorado* would be turned back when she reached Yokohama, for the reason that the *Alaska* was disabled from taking its place in the regular course of business of the company (owner), and was then undergoing repairs at Hong Kong. It does not appear, and therefore we can assume it as an established fact, that the parties did not know when the contract was made, those facts concerning the *Alaska*. It further appears from the facts found that the only connections which the *Colorado* had were those at Hong Kong—for it is stated in the tenth finding of facts that the custom and usage of the owner, the Pacific Mail Steamship Company, with reference to the voyages of their steamships between San Francisco

and Hong Kong with cargo laden for Hong Kong or Batavia, was for the vessel on which such cargo was taken at San Francisco, to carry the same to Hong Kong without transshipping it at Yokohama, at which port they touched, or making connection with any other vessel or vessels at the last named port for such purpose, and that this usage had existed without interruption since the first day of January, 1867, the time of the establishment of the company's line of steamers between San Francisco and Hong Kong, the only instance of such transshipment being that of the cargo in question. This in our judgment is enough to show that such were the connections and the only connections existing at the time that the policy was entered into—a connection to be made at Hong Kong.

Why should it be held that such were not the connections referred to in the policy? The word was used as of something then in being. We find something in being fully answering to the word used. The *Colorado* was spoken of in the policy as having connections. It did have connections at Hong Kong as found, and had no connections elsewhese. Why are not these the connections mentioned in the policy, and not any such temporary connection availed of and created on and for the occasion by reason of an exigency which had just occurred, and which neither of the contracting parties was aware of, at the time they entered into the contract of insurance.

Certainly we are justified in holding that the parties contracted with reference to a state of things known, and would not be justified in holding that they contracted with reference to a state of things unknown, unanticipated and temporary in its nature. If they had any intention to contract with reference to a change in the usual course, it might have been easily and clearly expressed in the contract.

But it is said that the plaintiffs had no knowledge of the custom and usage found in the tenth finding of fact. If they did not, it was their own fault. They were in effect told by the use of the word in the policy, that there were connections of the *Colorado*. The use of the word put them on inquiry. If they did not know it, certainly they would have inquired. But surely they knew what they were contracting about.

They were contracting about the connections of the ship *Colorado*, and we think they should not be held to have been ignorant of them. It is not averred in the pleadings that they did not know it. If they did not, it might be claimed that it was a mistake on their part—whether of fact or law, it is unnecessary to say. If a mistake of fact or of law, it might have the effect of releasing them from the obligation of the contract; certainly it could not extend the obligation of the defendant, or create a new one binding it. If the contract was not the contract they entered into, they should have proceeded to have it reformed. Not having done so, it must be construed as it is.

Nor does it make any difference that the words "custom and usage" are used in the finding with regard to this matter. The words used indicate a course of business pursued by the owners of the ship *Colorado* for a series of years and establishing a state of things referred to in the policy of insurance as existing at the time it was signed and delivered. It would not be proper to hold of this that it was a mercantile custom or usage, which did not bind the plaintiffs, because there is no finding that they were aware of it. It signifies a course of businsss of a particular line of steamships with reference to which a contract was made (1 Greenl. Ev. Section 292; The Schooner *Reeside*, 2 Sumner, 567), referred to in the written contract in such language as to show to men of but little experience in business matters that a course of business in existence was alluded to and meant. To come to any other conclusion would be to hold that the plaintiffs did not know what they were contracting about, a conclusion which nothing appearing in the record indicates, and from which the law withholds any justification.

This course of business had existed from January, 1867, to the time the policy was executed, which was on the twelfth day of August, 1874, more than seven years before the date just mentioned. Under the pleadings, evidence should be received to show the meaning of the word "*connections*," but not to show that the plaintiffs did not know what that meaning was.) 1 Greenl. Ev., § 592, Schooner *Reeside, ut supra.*)

The seventh and eighth conclusions of law are not proper deductions from the facts found. We understand them as

conclusions of law—as constructions of the instrument under the facts found, and not as findings of fact. If they were findings of fact they would be inconsistent with other findings, notably the tenth. As conclusions of law, they are not justly deducible from the facts.

The contract was made with reference to a voyage of the *Colorado* to Hongkong, where a connection would be made by a change of ship from that port to Batavia, unless the steamer became disabled and was rendered unnavigable, when a change of ship might have been made at Yokohama. Such change, at the port just named, might also have been properly made with the consent of the underwriters. Neither of these occurred, and therefore the change of ship was not allowable. The risk was changed, and the underwriters might well say *non in haec foedera veni.* Whether the risk was increased or diminished by the change, the result is the same. The terms of the contract do not allow it, nor does the law.

The loss at Hongkong occurred subsequent to the change of ship, and under the terms of the policy, the defendant was not responsible for any such loss occurring after that event. As the result here reached is conclusive, it is unnecessary to consider the other questions which were so ably discussed on the argument.

The judgment should be reversed and the cause remanded to the Superior Court of the City and County of San Francisco, with a direction to enter judgment for the defendant, and it is so ordered.

SHARPSTEIN and MYRICK, JJ., concurred.