[L. A. No. 22215.   In Bank.   Apr. 29, 1953.]

THOMSON BURTIS, Respondent. v. UNIVERSAL PICTURES COMPANY, INC. (a Corporation) et al., Appellants.

Loeb & Loeb, Herman F. Selvin and Harry L. Gershon for Appellants.

Fendler, Weber & Lerner, Harold A. Fendler, Robert W. Lerner and Jacques Leslie for Respondent.

EDMONDS, J.—Thomson Burtis, the author of an assertedly plagiarized screen play, was awarded damages for the unauthorized use of his literary property. The principal question presented for decision upon the appeal from the judgment concerns the sufficiency of the evidence to support the verdict of the jury.

■ In 1938, Burtis, an established professional writer, submitted an untitled story synopsis to Universal Pictures Company, Inc. The synopsis interested Universal to the extent that it entered into a written agreement with Burtis providing that, for $250, he would write an original story of not less than 10,000 words "suitable for a Danielle Darrieux photoplay" to be tentatively entitled "Manhattan Masquerade." He gave Universal an option, to be exercised within two weeks following delivery of the story, to purchase it for $3,250. In the event Universal did not exercise the option, it was to obtain no right, title or interest in the story.

Subsequently, Burtis wrote a story of about 20,000 words, which he delivered to Universal. The company did not exercise its option but retained both the untitled synopsis and the screen script in its files until this action was filed. A review of the synopsis, in mimeographed form, prepared by an employee of Universal, was available to all writers and producers on the lot.

In lieu of developing the personalities of characters in "Manhattan Masquerade," Burtis, in most instances, utilized the device of naming well known motion picture stars "to aid the reader in visualizing the characters" which he had in mind. The story may be summarized as follows:

Adolph Menjou is an impecunious bon vivant whose current economic objective is to marry Spring Byington, "the wealthiest widow in America." He is the author of "At Twenty—I Have Lived," a risqué novel written under the pen name of "Nanette." Andy Devine, a gardener formerly in Menjou's employ, has stayed with him in the capacity of valet while he awaits payment of wages now five years past due. Menjou's publisher is Horatio Livermore, a hypocritical and ruthless businessman who invents artistic excuses to

justify the publication of sexy novels. Lionel Stander, Livermore's press agent, is a frustrated writer who conceals his sensitivity with a sardonic, jeering attitude.

Despite Menjou's protests that he does not want to write any more of that "rot," Livermore insists upon a sequel to Nanette's first book, telling of her girlhood experiences in European boarding schools. To secure background material, Livermore sends Menjou to Paris. Before his departure, Menjou discovers that Prince Mischa Auer of Wetsalia has moved into the Byington ménage as a permanent, and unscrupulous, house guest.

In Paris, Menjou meets Gabrielle Roulet, a teacher of English in a finishing school. Although at heart a mischievous, if naive, flirt, at school she wears horn-rimmed spectacles and draws her hair "severely around her face." At home, with her hair down, she is charming. Her housekeeper is Vera Gordon, a Russian with an earthy sense of humor who delights in stuffing guests with her cooking. In between bouts of indigestion induced by Vera's culinary efforts, Menjou subtly secures from Gabrielle the information which he desires without disclosing his purposes.

Menjou returns to New York and, shortly thereafter, "At Eighteeen—I Had Also Lived" is published. It becomes an immediate best-seller, Nanette's identity being a question of public interest. The press clamors for information and Walter Winchell serves an ultimatum upon Livermore that he will discover Nanette if her identity is not revealed exclusively to him. Menjou, Livermore and Stander are desperate. Disclosure of Menjou as Nanette, it is feared, will ruin his plans to marry Mrs. Byington and also destroy the market for the books. They decide to bring Gabrielle to New York to act the role of Nanette.

Despite the instructions of Rene Petain, Livermore's exuberant Parisian agent, that she is not to leave her cabin during the trip, Gabrielle ventures forth and is seen by John Castle, young career diplomat. Castle manages to become acquainted with her by impersonating the steward serving her cabin. In a comedy sequence, Vera and Gabrielle discover his pretense. However, they keep their mission secret.

By the time Gabrielle reaches New York, the publicity concerning the mysterious Nanette has reached a crescendo. Stander has caused a Boston bookseller to be arrested for selling one of the books. When Gabrielle arrives, she and Vera are secretly installed in a swank apartment and coached

as to their roles. Suitable wardrobes and beauty treatments are provided. In a coup designed for the dual purpose of providing authenticity to the act and ridding himself of competition, Menjou employs Prince Mischa to pretend to have been one of Nanette's European lovers.

For the first time, Gabrielle reads the books which she is to pretend to have written. She is shocked and angered, but Vera, reveling in the story, persuades her to continue with the deception. Prince Mischa already has undertaken his role with vigor, running up fantastic bills to outfit himself and a growing host of fellow princes and blackmailing Menjou into meeting the overhead.

Once during her tutelage for the role she is to play, Gabrielle has slipped away from Andy Devine, now functioning as her bodyguard, to see young Castle, with whom she is in love. She still has not disclosed her dual identity to him.

As Nanette, Gabrielle is introduced to the press and society with a lavish, all-day program. She captivates the reporters, while Vera stuffs them with her cooking. Society is pleased, albeit somewhat shocked, by this vivacious siren with the naive manner. Alexander Woollcott is completely captivated by her frankness.

Disaster overtakes Gabrielle at a dinner party given by Mrs. Byington. There she is introduced to Castle's aristocratic parents and prospective fiancée as the notorious Nanette. Silently, she pleads with her eyes for Castle to understand her plight. He reacts with scorn and contempt.

Thereafter, the mad social whirl continues in an ever-mounting frenzy of publicity. Stander, realizing Gabrielle loves Castle, hides his own love for her and urges even more publicity. The Immigration Department begins an investigation of Nanette's entry into the country. Meanwhile, the FBI has taken an interest in her reputed activities as an espionage agent and her close association with Prince Mischa, a known foreign spy. Pretending a reconciliation, John Castle tricks Gabrielle into coming to Washington, where she is subjected to interrogation by J. Edgar Hoover. Gabrielle flees to the French Embassy for sanctuary.

There the story reaches its climax and conclusion as the principals gather and the full truth of the hoax is revealed. At Castle's request, Hoover threatens Gabrielle with deportation unless she marries an American citizen. Castle offers to marry Gabrielle, and a happy reconciliation is effected. Mrs.

Byington is delighted to discover that Menjou has written the books. Woollcott broadcasts the entire story and comments that the books have true literary quality. Prince Mischa, suddenly discovering himself again unemployed, promptly recoups his financial position by offering to marry Vera, who will receive 50,000 francs as payment for her part in the hoax. All ends happily in the marriages of the three couples.

On cross-examination, Burtis testified that the idea of a book being written under an assumed name was not original and that he had done the same thing himself many times during his career. The idea of attributing authorship of a risqué book to a woman when, in fact, it had been written by a man was, he said, a reverse twist upon actual occurrences in the literary lives of French authoresses Colette and George Sand. The climax of the story, possible deportation for moral turpitude, Burtis testified, was suggested by the true incident of Countess Cathcart who was refused admission to this country upon similar grounds.

According to Burtis, certain characters in his story had been suggested to him by various previously issued motion pictures. As he said: "All that a professional writer can do is take elements of recognizable characters, recognizable to anybody, and combine them in a new form, like a new chemical combination makes a new material, until boy meets girl becomes an original story because of the way that all the common elements are combined."

Almost eight years after Burtis had presented his story to Universal, it produced and released the motion picture "She Wrote The Book." The picture, which is a part of the evidence in the case, has been viewed by the Justices of this court.

As the picture opens, "Always Lulu" has become a best seller of such magnitude and questionable repute that it is banned in all of the important cities of the world. George Dixon, publisher, and Jerry Marlowe, his breezy, confident advertising manager, are worried because they know neither who, nor where, Miss Lulu Winters, the authoress, is. The press is demanding information. Unexpectedly, they receive a telephone call from Lulu announcing that she is coming to New York to pick up her royalty checks, amounting to more than $80,000. At her insistence, they promise no publicity.

Actually, Lulu is Phyllis Fowler, wife of the Dean of Croyden College, a small and financially foundering school in Great Falls, Indiana. She has kept her secret for fear of ruining her husband and the college. The faculty, ignorant of the situ-

ation, has banned "Always Lulu" and threatened to expel any students found reading it, of whom there have been a number. However, Mrs. Fowler believes that the royalty checks awaiting her must be secured to benefit the college.

Professor Jane Featherstone (played by Joan Davis), a prissy, mid-Victorian and apparently sexless female, is about to leave for New York to deliver a lecture to a scientific convention upon the "Featherstone Theory of Molecular Agglutination." Mrs. Fowler requests Jane to impersonate Lulu long enough to pick up the royalty checks while she is in New York. Jane is horrified by the revelation of authorship and revolts at the suggested impersonation, but finally agrees to the proposition for the good of the college.

On the train to New York, Jane meets Eddie Caldwell, a studious young engineer with whom she carries on a learned discussion concerning the mathematics of bridge construction. Upon arrival in New York, she agrees to meet him for dinner and Eddie gives her a snapshot of himself. However, neither of them learned the other's name.

Meanwhile, Jerry has arranged a parade with police escort, a press reception, and a round of social gatherings for Lulu when she arrives. These grandiose arrangements suddenly are discarded when Dixon and Jerry get their first agonized look at the prim professor, posing as Lulu. While they are attempting to decide how to handle this unexpected situation, Jane learns from Dixon's secretary of the elaborate arrangements made for Lulu's reception. In panic, she bolts from the building, pursued by Jerry. Jane jumps into a taxicab to effect her escape, losing her purse and all means of identification in the process. Jerry follows with motorcycle patrolmen, sirens wailing. Hearing the police, the taxi driver slams his cab to a stop, throwing Jane to the floor and rendering her unconscious.

When Jane awakens, she is suffering from amnesia. Jerry, sincerely believing that she is Lulu, tries to bring back her memory by reading "Always Lulu" to her. Having no reason to believe that she is not Lulu, Jane enters into the spirit of her supposed character with relish and soon is making advances toward Jerry.

After she has been properly outfitted, Jane is introduced to the press as Lulu. During the interview, she announces that there will be no sequel to her book. Dixon and Jerry determine that, if they are to have another story to publish, they must part Lulu from her money with rapidity. For this

purpose, they persuade a friendly bartender, Joe (played by Mischa Auer), to impersonate Count Boris Pototski, one of the many lovers mentioned in "Always Lulu." In the book, Boris had been an expert at spending Lulu's money and Joe promises to be equally adept at this pastime. Without further ado, Joe moves in as Jane's constant, and costliest companion. However, Joe's task soon is complicated by Horace Van Cleve, a middle-aged tycoon and would-be playboy who begins throwing money at Jane almost faster than the imaginative Joe can spend it. Jerry decides to end this problem by arousing Mrs. Van Cleve's jealousy.

As Jane's social life becomes more and more hectic, news of her role reaches Croyden College by way of "Vanity" magazine, which features a cover picture of Lulu. The shock is profound, and the faculty decide to have nothing more to do with her. Meanwhile, Jane has met Eddie again at the Van Cleve shipyard and asks him to dinner. Her only recollection of him is the picture, all that had remained of her possessions after the taxi accident. A companion informs Eddie of Lulu's identity and Eddie, after reading "Always Lulu," reacts with disgust.

That evening, the situation reaches a climax with almost the entire cast gathered in Jane's suite. Joe, the first to arrive, retires diplomatically to the bedroom as Eddie enters, kisses Jane violently, and then berates her for her supposed deception. Just as Eddie finishes telling Jane how contemptible he thinks she is, Mrs. Van Cleve appears brandishing a revolver, of which Eddie has the thoughtfulness to relieve her. Van Cleve walks into the melee dangling a diamond necklace for Jane, which he quickly transfers to his wife. Joe, his dignity unruffled, is discovered reclining in the bedroom. Jerry bursts upon the scene and, in attempting to defend Jane against Eddie's accusations, receives a punch on the jaw. Soon all are gone but Joe, who proposes marriage to Jane. She accepts, but unfortunately mentions that she now has no money left. Joe politely, but hastily, departs, reporting to Jerry that his job is completed.

But Jerry's task is far from over. If he is to get another book for Dixon, he must help Jane recover her memory. Because Eddie has said he met her on a train from Great Falls, Jerry decides to take her there. On the Croyden campus, they accidentally walk into a faculty meeting, where Jane is greeted with bitter accusations. She does not understand what is happening, and Jerry explains her illness to the faculty members,

who do not relent. As Jerry and Jane are leaving the campus, Jane happens to wander into her former classroom. Absent-mindedly, she corrects a mathematical error in a problem on the blackboard, and suddenly her memory returns.

Mrs. Fowler confesses to her husband that she is the author of "Always Lulu." But the disclosure means little now; Croyden College is about to close for lack of funds. Jane decides to return to New York to ask Van Cleve to provide money for the school. Her first approach as Professor Feather-stone is a complete flop. But, with Jerry's help, she tries again as the flamboyant Lulu. Disrupting a very formal party at Van Cleve's estate, she literally blackmails him into buying her off by providing money for the school. At the height of the confusion, Eddie arrives with important blue-prints for Van Cleve. In short order, he is fired, slugs Jerry, and turns Jane over his knee and spanks her, all without allowing anyone an opportunity to explain the situation to him.

Everything ends happily with Jane back on the Croyden campus. Eddie follows her to Great Falls. Van Cleve's money staves off immediate disaster. Jerry's release of the full story to the newspapers creates a sudden influx of students anxious to study literature under Lulu, promising continued pros-perity for the school.

The jury found in favor of Burtis. The motion of the defendants for a new trial was denied and their appeal is from the judgment entered upon the verdict.

The defendants contend that the evidence is insufficient to sustain the implied finding of plagiarism because there are no substantial similarities between their production and pro-tectible portions of Burtis' story. The determination of the extent to which a literary work is entitled to protection is, they say, a question of law which may be determined by the appellate court regardless of any implied finding by the jury. They also complain that the trial court erroneously instructed the jury upon the elements of plagiarism, protectible prop-erty, and damages. In addition, it is contended that the award of damages is excessive and that counsel for Burtis committed prejudicial misconduct. For the purposes of this appeal, it is conceded that some similarity exists between the productions as to a portion of the basic theme. Another concession is that the originality of Burtis' story, and the defendants' access to it, have been adequately proved.

Burtis disputes each of the contentions of the defendants. He argues that the questions of originality, protectibility,

access, similarity and copying are for the trier of fact, and may not be determined as a matter of law. A plot, or theme, he says, is protectible. Furthermore, he claims that the evidence shows misappropriation of his major characters, characterizations, motivation, treatment, and a substantial sequence of scenes and events.

The appellate court may determine whether the evidence of originality, protectibility, access, similarity and copying is sufficient to support the verdict. (*Golding* v. *R.K.O. Pictures, Inc.*, 35 Cal.2d 690, 695, 698-699 [221 P.2d 95]; *Stanley* v. *Columbia Broadcasting System, Inc.*, 35 Cal.2d 653, 662-663 [221 P.2d 73, 23 A.L.R.2d 216]; *Universal Pictures Co.* v. *Harold Lloyd Corp.*, 162 F.2d 354, 357; *cf. Weitzenkorn* v. *Lesser, ante,* p. 778 [256 P.2d 947]; *Kurlan* v. *Columbia Broadcasting System, Inc., ante,* p. 799 [256 P.2d 962].) If there is sufficient evidence to establish these elements of the tort, the verdict of the jury upon the questions of fact raised by the evidence will not be disturbed. However, in the final analysis, the sufficiency of the evidence is a question of law.

The defendants contend that a "theme," "idea," or "subsection of a plot" is not protectible and that the monopoly of common law copyright extends only to the treatment and manner of expression. However, at the time this cause of action arose, section 980 of the Civil Code provided that, "The author of any product of the mind, . . . has an exclusive ownership therein, and in the representation or expression thereof." Relying upon this former wording of the statute, the court held, in the Golding case, that the "product of the writer's creative mind" (p. 695) is protectible and extended protection to his idea, "the basic dramatic core" (p. 697) of his play. Thus, under the earlier form of the statute, a "theme" or "idea" was protectible, although at common law and under the 1947 amendment to the statute protection is extended only to "the representation or expression" of a composition. (*Cf. Weitzenkorn* v. *Lesser, supra.*)

One of the instructions of which the defendants complain was given in the language of the statute as it read at the time this cause of action arose. As applied to the facts of this case, the instruction is not erroneous.

A careful comparison of Burtis' story and the defendants' motion picture shows no similarity between them as to form and manner of expression. The motivation, characterizations, and sequence of events is essentially different in each. However, the defendants concede that there is some similarity

between the productions as to a portion of the basic theme. This consists of a risqué book written under a pseudonym by an author who, for personal reasons, does not wish to be identified. The public, naturally, is interested in the author's identity. A female schoolteacher is requested to impersonate the author, and a succession of events occurs, including the inevitable "boy meets girl" routine. The boy is disillusioned and disgusted when he is led to believe that the girl has a lurid past. All finally ends happily when "girl gets boy."

These similarities between parts of the basic dramatic core of each story are the only similarities discoverable from a comparison of the productions. Therefore, the question is whether they are sufficient, by themselves, to sustain the implied finding of copying of a substantial portion of Burtis' protectible property.

In holding the "basic dramatic core" of a literary production protectible in the Golding case, the court looked to the entire theme of the story. It said: "Literary property in the fruits of a writer's creative endeavor extend to the full scope of his inventiveness. This may well include, in the case of a stage play or moving picture scenario, the entire plot, the unique dialogue, the fundamental emotional appeal or theme of the story, or merely certain novel sequences or combinations of otherwise hackneyed elements." (Pp. 694-695.) In other words, under the statute as it formerly read, the original combination of unoriginal ideas into a dramatic theme might create a protectible property interest in the combination, although the separate ideas were not themselves protectible. As stated in the Stanley case, the isolated ideas may not be original, "But when all of these elements are joined to make one ideas for a radio program, it is the *combination* which is new and novel." (Pp. 663-664.)

Here, it is conceded that the combination of ideas is original. Therefore, the basic dramatic core of Burtis' story was protectible under the former wording of the statute. But there is no admission that each of the ideas in the combination was original and, in fact, Burtis' testimony shows the opposite. He states that the idea of a risqué book written under a pseudonym by an author who, for personal reasons, does not wish to be identified, was not original. Nor is there anything original in public interest in the identity of a notorious author. What was original, and thus protectible, was the combination of these and other ideas into a basic theme for a story.

Although the court will dissect a literary production to determine what portion thereof is protectible (*Golding* v.

*R.K.O. Pictures, Inc., supra*, p. 700), it will not examine the protectible portion to discover isolated similarities as to each segment of the whole. (*Stanley* v. *Columbia Broadcasting System, Inc., supra*, p. 662.) Instead, as was held in the Golding case, upon the issue of similarity the standard of the ordinary observer should be applied and comparison of the protectible portions should be made without dissection and without expert or elaborate analysis. (Pp. 699-700.) In that case, the basic dramatic core, the psychological situation, in each production was similar to the other in its entirety.

The only similarities which here appear may be found only as the result of dissection of the basic dramatic core of each story. Given only the elements of each story which are similar, and subtracting therefrom those which are admittedly unoriginal, there is no basic dramatic core. No framework is created by these elements alone which requires only body and filling to expand the central situation into a recognizable story. There is, in fact, no central situation. From these isolated elements, almost any basic dramatic core could be created and virtually any plot developed.

For the evidence to be sufficient to support a finding of similarity, and thus of copying, the two works must present a substantial similarity insofar as the plaintiff's property in his work is concerned. (*Golding* v. *R.K.O. Pictures, Inc., supra*, p. 699; *Stanley* v. *Columbia Broadcasting System, Inc., supra*, p. 663; cf. *Weitzenkorn* v. *Lesser, supra*.) "In determining whether the similarity which exists between a copyrighted literary, dramatic or musical work and an alleged infringing publication is due to copying, the common knowledge of the average reader, observer, spectator or listener is the standard of judgment which must be used." (*Stanley* v. *Columbia Broadcasting System, Inc., supra*, p. 662.) Here, without unnecessarily dissecting the basic dramatic core of each work, there is no substantial similarity between them to justify the finding of the jury, as the "average, reasonable man," that there was copying.

To have anything of value, Burtis had to add to the ideas above discussed certain vital ingredients which would create a dramatic situation. These included a deliberate hoax to be perpetrated upon the public by the male author and his publisher acting together. A reason for the hoax was essential, and Burtis supplied it in the form of economic necessity, sale of the book and marriage to a wealthy widow. It was also essential for his dramatic purpose that the hoax be discovered

under spectacular circumstances, so the deportation investigation is included. These elements, added to the others, establish a recognizable framework upon which to build a story.

However, none of the latter elements appear in the defendants' motion picture. No one perpetrates a deliberate hoax upon the public; the one attempted is upon the unsuspecting publisher. The essential ingredient is a victim of amnesia who honestly believes that she is the author of the lurid novel and that it accurately depicts her past. By this device, the motion picture is made essentially humorous, whereas Burtis' story is serious drama with some comedy relief. In the motion picture, the central problem is to assist the principal character in recovering her true identity; in Burtis' work it is how to hide identity. Thus, in the picture, there is no necessity for a spectacular explosion of a myth. Here, again, is a basic dramatic core when these elements are added to the others, but there is no similarity between it and the framework of Burtis' story.

Burtis also contends that five major characters in both productions are substantially the same in characterization, motivation and treatment. The very fact that Burtis failed to develop in detail any of the characters in his story weakens his contention considerably. Any similarities are only of the most general nature. Gabrielle and Jane both are schoolteachers, naive, and possessed of the common trademarks of fictionalized female teachers. But Gabrielle is a vivacious and mischievous flirt; Jane is so strait-laced that she finds it necessary to screen a partially undraped statuette and can strike up an acquaintance with a strange man only by discussing mathematical formulae. John and Eddie both possess morally correct ideas of conduct and are dismayed at the supposed identities of their respective girl friends. However, John is the thoroughly trained, unruffled, gentle-mannered socialite sophisticate. Eddie, on the other hand, is a rough-and-tumble engineer who engages in public brawls and thinks nothing of crushing a girl in his arms and then berating her lack of morals or of administering a public spanking to a woman. Livermore and Dixon are both publishers of a notorious book, but the former is a confirmed hypocrite, the latter solely a businessman. The press agents are vastly different, Stander being a hard-bitten cynic who refuses to permit even love to stand in the way of his duty while Jerry is a sympathetic soul anxious to assist Jane in every possible

way. Mischa Auer, of course, remains Mischa Auer, portraying his usual role. Certainly it cannot be said that an author may forever prevent an actor from earning his living by the simple device of casting him as a character in an unpublished story.

Although it might be possible that an author could so carefully delineate a character as to secure a protectible property interest in that character, generally it is held that a character is not included within the monopoly of copyright. (*Warner Bros. Pictures* v. *Columbia Broadcasting System,* 102 F.Supp. 141, 147; *Detective Comics* v. *Bruns Publications,* 111 F.2d 432, 434.) Here there has been no such careful development of characterizations. Only the barest outlines have been drawn, leaving the remainder to the talents of the particular actors chosen to fill the roles. "It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly." (*Nichols* v. *Universal Pictures Corp.,* 45 F.2d 119, 121, cert. denied 282 U.S. 902 [51 S.Ct. 216, 75 L.Ed. 795].)

These conclusions make it unnecessary to consider the contentions concerning the propriety of certain instructions, the award of damages, and the conduct of counsel for Burtis. In this case, all of the possible evidence bearing upon the issue of similarity has been presented to the court in the form of the productions themselves. There being no evidence of substantial similarity between the motion picture and protectible portions of Burtis' production, the implied finding of copying of Burtis' property has no support in the record. Under these circumstances, this court may direct entry of a proper judgment. (Code Civ. Proc., § 53; *cf. Pollitz* v. *Wickersham,* 150 Cal. 238, 251 [88 P. 911]; *Schroeder* v. *Schweizer L.T.V.G.,* 60 Cal. 467, 471-472 [44 Am.Rep. 61].)

The judgment is reversed with direction to the superior court to enter a judgment for Universal Pictures Company, Inc., Warren Wilson, Oscar Brodney and Joseph Gershenson and denying relief to Thomson Burtis.

Gibson, C. J., and Shenk, J., concurred.

Traynor, J., and Spence, J., concurred in the judgment.

SCHAUER, J.—I concur in the judgment and in what is hereinafter specified as being what I understand Justice Edmonds' opinion actually holds; I further agree that "A

careful comparison of Burtis' story and the defendants' motion picture shows no similarity . . . as to form and manner of expression." I do not agree with what is said in Justice Edmonds' opinion in attempting to distinguish this case from *Golding* v. *R.K.O. Pictures, Inc.* (1950), 35 Cal.2d 690, 710-712 [221 P.2d 95].

This case, it appears to me, is controlled by exactly the same principles which should have controlled in the Golding case. The plot (or, as Justice Edmonds denominated it, the "basic dramatic core") used by the plaintiff and the defendants in this case, is, as was true in the Golding case, in the public domain. It is to the credit of both the intelligence and the integrity of Mr. Burtis, the plaintiff here, that he testified "All that a professional writer can do is take elements of recognizable characters, recognizable to anybody, and combine them in a new form, like a new chemical combination makes a new material, until boy meets girl becomes an original story because of the way that all the common elements are combined." There being nothing new or novel in the plot it is not, as such, protectible. Hence, unless the author's combination, embellishment and treatment of the common materials of the public domain do in truth create what Burtis likens to "a new material" made by "a new chemical combination" of the old elements, there is, at least generally speaking, no protectible product of the mind.

The basic holding here, essential to the judgment, appears to me to be irreconcilably inconsistent with the Golding holding. The suggestion is made that the Golding decision was based on the "former wording of the statute" (Civ. Code, § 980) and that because of the subsequent amendment of the statute this case can be distinguished from and is not controlled by the Golding case. Justice Edmonds here says "Thus, under the earlier form of the statute, a 'theme' or 'idea' was protectible, although at common law and under the 1947 amendment to the statute protection is extended only to 'the representation or expression' of a composition." But in the Golding case the majority said (pp. 694-695 of 35 Cal. 2d) : "The rights asserted in this case are not based upon statutory copyright but stem from the so-called common-law copyright . . . It is . . . only the product of the writer's creative mind which is protectible . . . The question as to whether the claimed original or novel idea has been reduced to concrete form is an issue of law . . . Certainly, if the only product of the writer's creative mind is not something which

the law recognizes as protectible, that is, an idea not reduced to concrete form . . . , no right of action for infringement of literary property will lie. . . .''

For the reasons indicated above and more fully developed in my dissent in the Golding case (pp. 710 et seq. of 35 Cal.2d) and concurring opinion in *Stanley* v. *Columbia Broadcasting System, Inc.* (1950), 35 Cal.2d 653, 668 et seq. [221 P.2d 73, 23 A.L.R.2d 216], I would hold that a plot as such, being in the public domain and neither new nor novel, is not protectible and that only the original and (except in special circumstances not here pertinent) novel treatment of a plot,[1] which treatment (as so aptly described in the above set forth quotation from Mr. Burtis' testimony) is the creation and product of the author, can be protectible. This holding, it seems to me, appears upon analysis to be the holding now actually made by this court; it is inherent in its judgment. I would clearly declare it to be such and expressly overrule the Golding case.

Carter, J.—I dissent.

The majority opinion in this case goes one step farther than that in *Weitzenkorn* v. *Lesser, ante,* p. 778 [256 P.2d 947] and *Kurlan* v. *Columbia Broadcasting System, ante,* p. 799 [256 P.2d 962]. Here, after a trial by jury, this court holds that there was no similarity between the infringed and infringing productions. The effect of this opinion is to deprive an author of a cause of action for plagiarism in this state.

In the Kurlan and Weitzenkorn cases, the majority states that an author may protect his idea, etc., by an express contract. Here, plaintiff did exactly that. ''In 1938, Burtis, an established professional writer, submitted an untitled story synopsis to Universal Pictures, Inc. The synopsis interested Universal to the extent that it entered into a written agreement with Burtis providing that, for $250, he would write an original story of not less than 10,000 words 'suitable for a Danielle Darrieux photoplay' to be tentatively entitled 'Manhattan Masquerade.' He gave Universal an option, to be exercised within two weeks following delivery of the story, to purchase it for $3,250. In the event Universal did not exercise the option, it was *to obtain no right, title or interest in the story.*

---

[1] I am, of course, not here dealing with, or suggesting that there cannot be, an original and novel idea, or treatment of an idea, which does not involve a plot.

"Subsequently, Burtis wrote a story of about 20,000 words, which he delivered to Universal. The company did not exercise its option but retained both the untitled synopsis and the screen script in its files until this action was filed. A review of the synopsis, in mimeographed form, prepared by an employee of Universal, was available to all writers and producers on the lot in several bound volumes of story materials."

The majority points out that "the originality of Burtis' story, and the defendants' access to it, have been adequately proved." And that "some similarity exists between the productions as to a portion of the basic theme." In order to prevent recovery by plaintiff, this court determines for itself that no similarity exists between the two productions. This conclusion is reached despite the fact that the trial judge in the first instance, as provided for by section 426(3) of the Code of Civil Procedure, first determined on demurrer that there was similarity between the two, as it did on defendants' motion for a directed verdict at the close of plaintiff's case, as did a jury, as did the trial court again on a motion for a new trial, and as did three members of the District Court of Appeal ((Cal. App.) 237 P.2d 41) in affirming the judgment.

In *Weitzenkorn* v. *Lesser, supra,* it is said that "The question of *protectibility* need not be considered in determining the sufficiency of the allegations of the first count of the complaint, based on an express contract" and that "An idea, if valuable, may be the subject of contract. While the idea disclosed may be common or even open to public knowledge, yet such disclosure if protected by contract, is sufficient consideration for the promise to pay (citations).' " Here, it is said that "The only similarities which here appear may be found only as the result of dissection of the basic dramatic core of each story. Given only the elements of each story which are similar, *and subtracting therefrom those which are admittedly unoriginal,* there is no basic dramatic core. No framework is created by these elements alone which requires only body and filling to expand the central situation into a recognizable story. There is, in fact, no central situation. From these isolated elements, almost any basic dramatic core could be created and virtually any plot developed." So far as an express contract is concerned, there is no need for all portions of the production to be original (see *Weitzenkorn* v. *Lesser, supra*) . Therefore, it is not necessary to "subtract" the admittedly unoriginal elements from Burtis' story in comparing the two for the purpose of determining similarity.

Further, there is a basic core, or central theme, to Burtis' story. He has an author of a risqué book who wishes to remain anonymous. The sex of the author is different in the motion picture but the book is also a risqué one. There is a hoax perpetrated on the public. In each case the hoax is developed differently but nevertheless perpetrated for the same reason— that the real author wishes to remain anonymous. In both cases, a schoolteacher is the person chosen to impersonate the author. In both cases, there is a ''phony'' member of the nobility to add a comedy touch, although the theme is developed differently in the two. In both cases there is an upright and moral young man who is horrified to find that his girl has written such ''trash.'' Again, the two love stories are developed differently. In both productions there is a pecuniary necessity for money, and here, too, the idea is developed differently in the two.

This statement is found in the majority opinion: ''Although the court will dissect a literary production to determine what portion thereof is protectible (*Golding* v. *R.K.O. Pictures, Inc., supra*, p. 700, it will not dissect the protectible portion to discover isolated similarities as to each segment of the whole.'' It is admitted that the so-called protectible portion here is the basic dramatic core of Burtis' story (held so because of the former wording of Civ. Code § 980). In ''dissecting'' it is apparent to the average observer (as has been proved by the judicial background in this case) that the central theme, as set forth above, is similar to that found in defendant's motion picture. Whether or not that central theme is original in its entirety is, under the pleading and proof in this case, not important because here, there was an express contract and agreement by defendants to pay for plaintiff's story if they used it. The contract provided that plaintiff was to write a ''complete original story'' for which defendants would pay if it was used by them. While the ideas are not individually original, it is conceded that ''the combination of ideas is original.'' A plot is defined as a number of incidents which together form the action of a play or novel (Amdur, Copyright Law and Practice, 3, 703); ''A plot is a connected series of motivated events or situations, *forming the pattern, outline or skeleton of the story action*. It is a statement of the problems or obstacles that confront certain characters, their reactions to those problems or obstacles and the result'' (Ball, The Law of Copyright and Literary Property, § 171, p. 366; *Shipman* v. *R.K.O. Radio Pictures*, 100

F.2d 533; *Roe-Lawton* v. *Hal E. Roach Studios*, 18 F.2d 126; *Nichols* v. *Universal Pictures Corp.*, 45 F.2d 119; *Harold Lloyd Corp.* v. *Witwer*, 65 F.2d 1). (Emphasis added.)

It is true that there are differences in the minor characters and the development of each one, but as Mr. Justice Edmonds said in *Golding* v. *R.K.O. Pictures, Inc.*, 35 Cal.2d 690, 699 [221 P.2d 95], "The basic factors of the play and the moving picture show strong similarity in their respective plots although superficially there is considerable difference. *But such differences go to the quality of the plagiarism, and not to its existence or nonexistence.*" (Emphasis added.)

The majority, after admitting that the verdict of the jury upon questions of fact will not be disturbed if there is evidence to support it, states that "in the final analysis, the sufficiency of the evidence is a question of law." It is a question of law, but to no greater extent in plagiarism cases than in any other type of case where there has been a jury verdict. When a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury, and when two or more inferences can be reasonably deduced from the facts, *the reviewing court is without power to substitute its deductions for those of the trial court* (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427 [45 P.2d 183]; *Juchert* v. *California Water Service Co.*, 16 Cal.2d 500 [106 P.2d 886]; *Richter* v. *Walker*, 36 Cal.2d 634 [226 P.2d 593]; *Alexander* v. *Angel*, 37 Cal.2d 856 [236 P.2d 561]). Here, contrary to the well settled rule, this court has made a determination, de novo, on the question of similarity which had been, prior to this decision, determined favorably to plaintiff three times by the trial court, once by the jury, and once by the District Court of Appeal.

There has always been decided and strong opposition toward any change in the jury system. It is argued that to have all issues tried by the court, sitting without a jury, would add greatly to the labors of the court, tend to cause inaccuracy in and hostile criticism of its decisions of fact, and would expose the judiciary to attempts at bribery or charges of corruption which would lower its standing in popular estimation.

In Yeaman, Study of Government (chapter XIII, 177, 178), it is said that "when men talk gravely of substituting the learning and experience of the court for the good sense, practical experience and unbiased instincts of an impartial jury,

they do violence to history, and injustice to the cause of personal liberty and right. And while I would not let a jury trench a hair's breadth upon the province of the court, I have no hesitation in saying that, for trying and settling disputed questions of fact, through the instrumentality of human testimony, where men and their motives are to be weighed and scrutinized, and balances are to be struck between conflicting witnesses, I had rather trust to the verdict of twelve fair-minded men of average shrewdness and intelligence in a jury-box, than the judgment of any one man trained to the habits of judicial investigation and accustomed to measure his conclusions by the scale and standard of the law. I had rather trust to the honest instincts of a juror, than the learning of a judge. Nor do I believe that . . . there are more instances of mistaken verdicts than of mistaken rulings of law. The most we can expect from either jurors or judge, is an approximation to accuracy in the respective spheres in which they act.''

Whatever the origin of the jury system may have been (whether derived from Scandinavian or Roman sources) it is well established that it was not until the reign of Edward III, about 1352, that trial by jury, such as we now understand it, came into existence. From then on, however, there has persisted a strong popular conviction among English-speaking peoples, that no person should be deprived of his life, liberty or property except by the concurrent judgment of 12 of his peers. As early as 1215, there was incorporated into the Magna Charta a provision which guaranteed the people this right: ''No free man shall be taken or imprisoned, nor be disseised of his freehold or liberties . . . nor shall we pass upon him or condemn him, but by the lawful judgment of his peers.''

During the Middle Ages, the jurymen were chosen because of their knowledge of the facts and performed the duties of the present day jury as well as those of witnesses; early in the 15th century in England, the system changed so that the jury made its decisions founded upon evidence supplied by witnesses; and changes in rules of evidence, as well as the right to challenge jurymen, together with improved methods of impanelling the jury, led to our modern jury system. Then, when we consider that our American law and legal institutions had their origin in the judicial system of England, as it had been developed over centuries of human experience prior to the time of our colonization, it is not surprising that

this heritage, so zealously guarded by the British in bygone generations, is looked upon today by American citizens as one of the most precious rights secured to our forefathers. And whereas a century and a half of development has produced great changes in many of our political institutions, the fundamental principles of trial by jury have continued the same in most essential respects.

The jury system, constituting as it does, an integral part in the administration of justice, is emphatically a political institution, for the administration of justice in a democracy, such as ours, constitutes the basis of free government. As Joseph H. Choate once clearly stated "The jury system as it has existed for ages is fixed as an essential part of our political institutions, and it is appreciated as the best and perhaps the only means of admitting the people to a share, and maintaining their wholesome interest in the administration of justice."

It is therefore of greatest consequence that justice should be dispensed, not only with the utmost purity, but in a manner calculated to merit the confidence and satisfaction of the public. *It should stand for the love of "fair play," and abhorrence of injustice. In fact, the very essence of the jury trial is its principle of fairness.* The right of being tried, or having his civil controversies tried, by his equals—his fellow citizens—taken indiscriminately from the mass; who bear him neither malice nor favor, but simply decide according to what in their conscience they believe to be the truth, should instill in every man a confidence that he will be dealt with impartially, and inspire him with the wish to mete out to others the same measure of equity he would wish and expect to be meted out to himself—each man in judging his neighbor realizing that he also may be judged in turn ("Judge not, that ye be not judged.") Jury service places the people themselves, or at least a representative group of them, upon the seat of judgment; and to this extent actually places the direction and control of society in their hands. In fact, the "trial by jury," is the only instance of judicial power, which the people have reserved unto themselves.

"And when twelve impartial men, chosen at random from the neighborhood of the controversy, aided by the experience and authority of a judge, shall have declared under the sanction of an oath, what is the truth upon disputed facts, the verdicts they render, assuming the jury to be representative of the citizenry of the community, may be deemed to

represent the state of public feeling and spirit, and a tolerably correct index of the opinion entertained by society, on the rights and obligations in issue." ("Twelve Men in a Box," by Stanley F. Brewster, Member of the New York and District of Columbia Bars.)

The Seventh Amendment to the Constitution of the United States provides: "Sec. 1. In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of the United States, than according to the rules of the common law." (Proposed Sept. 25, 1789; ratified Dec. 15, 1791.)

Article I, section 7 of the California Constitution provides: "The right of trial by jury shall be secured to all, and remain inviolate; but in civil actions three-fourths of the jury may render a verdict. . . ."

That the jury trial has always been considered to be one of the greatest rights of free men can be seen from the fact that the Charter of 1681, granting to William Penn what came to be called Pennsylvania, extended full power to make all necessary laws (subject to royal veto) and included a "Bill of Rights" in which was an express provision of the right of trial by jury. The "Frame of Government" of the Province of Pennsylvania, confirmed by its First Provincial Council (1682) provided that "all trials shall be by 12 men, and as near as may be peers or equals of the neighborhood and men without just exception."

The case of Plymouth Colony is typical. One of the first laws passed after the settlement declared "that all criminal facts, and also all manner of trespasses and debts between man and man shall be tried by the verdict of twelve honest men to be empaneled by authority in the form of a jury upon their oath."

It should also be noted that the Declaration of Independence lists as one of the "repeated injuries and usurpations" of the English King, "depriving us, in many cases, of the benefit of trial by jury."

A general constitutional provision guaranteeing inviolability of the right of trial by jury forbids any substantial infringement of that right. What is this court doing but infringing this constitutional right to a trial by jury when, as in this case, it overturns the result reached not only by a jury, but by the trial court on the motion for a directed verdict and a motion for a new trial? It appears to me that

this court is doing indirectly what it is forbidden to do directly —that it is abrogating the right of an individual to have his case tried by a jury of his peers. It has done essentially the same thing in many recent cases and the list is an ever-growing one. Yet the members of this court, who join in the majority opinion, avidly take loyalty oaths although not required to do so. All of these oaths contain a solemn vow to support the Constitution of the United States and the Constitution of the State of California. Does not the nullification of the constitutional provisions here involved violate these oaths?

There can be no doubt that this court, by its decision here, has usurped the functions of the trial court, the jury, and the District Court of Appeal, and, in the future, such cases may as well be brought here in the first instance, since the well settled and established rule set forth has been abrogated. By its decision here it also puts a premium on theft which I had always understood was a crime in this state.

I would affirm the judgment.

Respondent's petition for a rehearing was denied May 28, 1953. Carter, J., was of the opinion that the petition should be granted.