**MIDAS PRODUCTIONS, INC., Plaintiff,**

v.

**Max BAER, Jr., Roger Camras, Richard Compton, Samuel Z. Arkoff, American International Pictures and Max Baer Productions, Defendants.**

**No. CV 76–579–DWW.**

United States District Court,
C. D. California.

Sept. 30, 1977.

Willard D. Horwich, Willard D. Horwich, Inc., Los Angeles, Cal., for plaintiff.

Lillick McHose & Charles, Kenneth E. Kulzick, Andrew W. Robertson, Los Angeles, Cal., for defendants.

## JUDGMENT

DAVID W. WILLIAMS, District Judge.

Plaintiff consists of a group of businessmen-investors, all residing in Tupelo, Mississippi, organized by a physician, who purchased a photoplay script from an amateur author and registered it for protection under § 12 of the Copyright Act on July 15, 1974. The story was called "Rednek Amerika—Love it or . . ." It centered around three young people, one of them black, who were traveling by auto and motorcycle from San Francisco to the Deep South. They were made victims of rural bigotry, and were falsely accused of a murder. In fact, the murder was committed by a redneck deputy sheriff who organized the search party to look for the youths.

Plaintiffs contracted for the services of Max Baer to play the role of Billy Bob, the deputy sheriff, and production of the film was begun in Tupelo. After a day or two of shooting, Baer complained that the script was inferior and the director incompetent. He returned to Hollywood, taking a copy of the script with him, ostensibly to have another writer examine it to see if it could be rewritten. He gave a copy of the script to defendant, Richard Compton, a talented playwright; but Baer was unable to get the plaintiffs to engage Compton for the purposes of making suggested changes in the story. This effectively ended Baer's connection with the Tupelo company, although the company continued with its efforts to

---

**18.** See footnote 12, *supra*.

make a film. After several false starts, the Tupelo people finally managed to put together a revised script of "Rednek" and made a film which has to this date not been distributed.

Shortly after returning from Mississippi, Baer conceived the idea to write a script about young people with long hair making a trip from California to the Deep South. He secured the writing talents of Compton to aid in putting the story together. Baer organized his own group of investors who financed the filming of the story, with Baer acting in the capacity of both actor and producer. The picture was made in or near Sacramento, California, and was given the title of "Macon County Line." After considerable trouble in getting a distributor to purchase it, the picture was finally sold to defendant, American International Pictures, who marketed it for a phenomenal gross rental of approximately $10 million. There is no evidence that Baer attempted to secrete from the Tupelo investors the fact that he had written a script of his own. On the contrary, he kept them informed of his new efforts, and solicited their investment into his venture. He also invited them to attend the early screening of the finished film in California, and the wife of the doctor' did, in fact, attend.

Plaintiffs filed this copyright infringement action alleging that Baer and Compton copied their copyrighted property in making "Macon County Line." A prima facie case of copyright infringement is established by proof of, 1) access to the allegedly infringed work, and 2) "substantial similarity" between the two works. Nimmer on Copyright §§ 141.2 et seq.; *Reyher v. Childrens Television Work Shop*, 533 F.2d 87, 90 (2nd Cir. 1976); and *Arnstein v. Porter*, 154 F.2d 464 (2nd Cir. 1946). There is no question but that defendants, Baer and Compton, had "access" to the script of "Rednek". It is admitted that Baer read the entire document, criticized it, and returned to Hollywood with a copy of it. There is also evidence that this copy was given to Compton who testified that he read approximately half of it. The principal issue is whether "Macon" was "substantially similar" to plaintiff's property.

Plaintiff's expert witness, who holds a doctor's degree in English, compared the two pieces and found substantial similarity as to plot, characters, setting and theme. She pointed out the following similarities of plot:

1. Three young people travel through the South.

2. While stopped at a service station, they are warned by a lawman to "keep moving."

3. Their vehicle becomes stranded after a breakdown.

4. They camp out.

5. A murder occurs, and circumstantial evidence suggests the trio to be guilty of the murder.

6. The trio is pursued.

7. One of the young people in "Rednek" is murdered and two of them in Macon are murdered.

The witness further pointed out that in each of the scripts the members of the trio were in their early 20s and wore long hair. In each script there was a romantic involvement between a female hitchhiker who joined them and one of the group, and that this relationship included a scene of nude frolicking in the water. The witness also pointed out that both "Rednek" and "Macon County Line" had a scene in a service station in which the service station operator's wife was depicted as a fat, course, country woman. Additionally, there was a scene common to both that took place in a diner in which the young travelers "ripped off" the cafe owner.

Defendants produced witnesses who were conversant with the writing and producing of "exploitation" type films. Those witnesses offered a laundry-list of pictures, both before and after the authorship of "Rednek", all of which were woven around a familiar matrix of ideas which, according to the witnesses, are common to all pictures which show young people of the '60s "on the move." These pictures included most of the following components:

1. Long-haired males in their early 20s traveling in a rural or Deep South area on motorcycles, vans or automobiles. The vehicles are shown to be unusual in construction and of the type that appeals to young people.

2. The trip is financed by the sale of drugs.

3. An attractive female hitchhiker is picked up along the way and becomes involved with one of the males in sexual encounters which culminate in a scene of nude bathing in a lake, stream or water tank.

4. The vehicle becomes disabled and help is sought at a dilapidated country service station or garage operated by a redneck type who barters for the cost of repairs.

5. A lawman, as well as other local country people, encounter the long-haired strangers, treat them with disdain, and subject them to ridicule and assault.

6. A scene is developed in a country diner during which one of the young people makes his exit after a full meal without paying the bill.

7. A murder occurs under circumstances that focus attention upon the young people as the perpetrators, when, in fact, they are innocent.

8. A chase ensues during which one or more of the young innocents are brutally slain.

Defendants' witnesses point out that the "exploitation" pictures are formulated to appeal to a market that is between the ages of 16 and 24. For this reason the protagonists in these films are young and the older characters are shown as corrupt, lawless, and bigoted.

■ A comparison of the two scripts indicates that the differences outweigh the similarities. For instance, the temporal settings of stories are dissimilar. "Rednek" depicts the drug culture and hippies of the late 1960s; while "Macon County Line" is set in the 1950s and involves the mischie-vous, but reasonably wholesome youth of that era. In addition, the characterization of the parallel roles is treated differently. "Rednek's" sheriff is a racist philanderer who kills his wife's lover and then seeks to blame the crime on the protagonists. By contrast, the sheriff in "Macon County Line" is a devoted family man who exhibits much less of the courseness and intolerance of his counterpart. The wife of the sheriff in "Rednek" is shown as promiscuous, in contrast to the portrait of the faithful wife of "Macon County Line." In sum, the contrasts between the movies indicates that the Baer-Compton script was an independent creation.

■ Plaintiff asserts that the copyright on "Rednek" is infringed. This position misconceives the ambit of their copyright. Copyright protection is given only to the expression of the idea, not the idea itself. *Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 98 L.Ed. 630 (1954); *Herbert Rosenthal Jewelry Co. v. Kalpakian*, 446 F.2d 738 (9th Cir. 1971). Thus, in *Baker v. Zelden*, 101 U.S. 99, 25 L.Ed. 841 (1879), the Court held that a copyrighted book on a peculiar system of bookkeeping was not infringed by a similar book which achieved similar results but used a different arrangement of the columns and different headings.

■ In the literary field this rule means that themes and plots are not protected. *Shipman v. RKO Pictures*, 100 F.2d 533, 538 (2nd Cir. 1938). They are in the public domain. Likewise, there can be no property interest in stereotyped characters. "Almost every story and motion picture about the old west contains some stereotyped roles of hero, heroine and villain. Necessarily, character traits of individuals portraying these roles will exhibit similarities." *Funkhouser v. Loews Inc.*, 208 F.2d 185, 189 (8th Cir. 1955).

■ Nor does copyright protect against the borrowing of abstract ideas contained in the copyrighted work. *Burtis v. Universal*

*Pictures Co.,* 40 Cal.2d 823, 256 P.2d 933 (1953), Nimmer § 143.11, p. 621. To grant property status to a mere idea would permit withdrawing the idea from the stock of materials which would otherwise be open to other authors, thereby narrowing the field of thought open to development and exploitation.

I must conclude from the evidence, and from having read plaintiff's script and viewed defendant's film (as well as having viewed "Easy Rider," a pre-Rednek production) that plaintiff's suit for actionable infringement must fail.

Judgment for the defendants.